The TOWN OF NEW WINDSOR,
Plaintiff,

v.

TESA TUCK, INC., Frye Copysystems, Inc., GAF Corporation, Lightron Corporation, Inc., Eugene Littman, and Harry Basch, Defendants.

TESA TUCK, INC., Frye Copysystems, Inc., GAF Corporation, Lightron Corporation, Inc., Third–Party Plaintiffs,

v.

KOLLMORGEN INSTRUMENTS CORPORATION, The New York State Department of Transportation, The State of New York, The New York Thruway Authority, The United States of America, James S. Patsalos, James S. O'Neill, Charles T. Kavanah, Cornell Group Service Corp., Mearl Corporation, Coca–Cola Bottling Company of New York and City of Newburgh, Third–Party Defendants.

No. 92 CV 8754 (BDP).

United States District Court,
S.D. New York.

March 14, 1996.

judgment is entered, $1.98 per day should accrue.

Bleakley Platt & Schmidt, White Plains, NY, for Plaintiff.

Kiefferr and Hahn, New York City, for Defendant, Third–Party Plaintiff & Cross Claimant Tesa Tuck Inc.

Bingham Englar Jones & Houston, New York City, for Defendant & Third–Party Plaintiff Frye Copysystems Inc.

Attorney General's Office, N.Y.S. Department of Law, Environmental Protection Bureau, New York City, for Third–Party Defendants N.Y.S. Thruway Authority, The N.Y.S. Dept. of Transportation and the State of New York.

Eisen, Herschcopf & Schulman, New York City, for Third–Party Defendant Mearl Corporation.

Pirro, Collier, Cohen, Crystal & Bock, New York City, for Third–Party Defendant Coca Cola Bottling Co. of N.Y. Inc.

Oppenheimer, Wolff & Donnelly, New York City, for Defendant & Third–Party Plaintiff & Cross Defendant GAF Corp.

Keane & Beane, White Plains, NY, for Defendant & Third–Party Plaintiff Lightron Corp.

Neuman Tamsen & Greher, Newburgh, NY, for Defendant Harry Basch.

Crowell and Moring, Washington, DC, for Third–Party Defendant & Cross Defendant Kollmorgen Instruments Corp.

U.S. Attorney's Office, New York City, for Third–Party Defendant U.S.A.

Cuddy & Feder, White Plains, NY, for Third–Party Defendants James S. Patsolos, James S. O'Neill, Charles T. Kavanah & Cornell Group Service Corp.

Carter, Ledyard & Milburn, New York City, for Defendant City of Newburgh.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

Plaintiff Town of New Windsor ("the Town") brought this action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), P.L. 99–499 (October 17, 1986), specifically 42 U.S.C. § 9607 ("§ 107") and 42 U.S.C. § 9613 ("§ 113"), and state nuisance law against defendants Tesa Tuck, Inc., Frye Copysystems, Inc., GAF Corporation, Lightron Corporation, Inc., Eugene Littman and Harry Basch, seeking recovery of its costs in cleaning up the New Windsor landfill.

In 1994, four of the defendants commenced third-party actions against Kollmorgen Instruments Corporation, the New York State Department of Transportation, the State of New York ("the State"), the New York State Thruway Authority, the United States of America, James S. Patsalos, James S. O'Neill, Charles T. Kavanagh, Cornell Group Service Corp., Mearl Corporation, Coca–Cola Bottling Company of New York [1] and City of Newburgh.

---

**1.** On August 4, 1995 the Town settled its claims against Coke–NY.

Before this Court are the motions of (1) defendants Tesa Tuck, GAF, Frye, and Lightron and third-party defendants Kollmorgen and Coke–NY for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing the complaint in its entirety ("Motion #1"); (2) the Town to amend the First Amended Complaint to add as defendants Kollmorgen, Mearl and Coke–NY, pursuant to Rule 15 of the Federal Rules of Civil Procedure ("Motion #2"); (3) the State to amend its pleading to realign as a party plaintiff, pursuant to Rule 15 of the Federal Rules of Civil Procedure ("Motion #3"); and (4) the United States to dismiss the Town's § 107 claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Motion #4").

## BACKGROUND

The Town was the owner and operator of the New Windsor landfill ("the landfill"), which operated from 1962 until 1976. In the 1980s, the New York State Department of Environmental Conservation ("DEC") deemed the landfill a significant threat to public health or to the environment, and listed it on its registry as an Inactive Hazardous Waste Site. In 1986, the United States Environmental Protection Agency ("EPA") rejected the DEC's nomination of the landfill for listing on CERCLA's National Priorities List ("NPL").

In 1989, the Town and DEC executed an Administrative Order on Consent ("Consent Order") requiring the Town to conduct a detailed investigation of the landfill and to develop and implement a remedial plan, and declaring it eligible for 75% reimbursement by the State of part of its clean up costs, pursuant to the New York Environmental Quality Bond Act of 1986 ("EQBA").[2] Reimbursement was conditioned on the Town's pursuit of this cost recovery action against those who contributed to the landfill, 75% of the recovery from which would be shared with the State. In February 1990, the DEC

entered a State Assistance Contract (# C300069) with the Town to reimburse the Town for 75% of the eligible clean-up costs incurred in remediating the landfill. In exchange, the Town agreed to take all reasonable steps to recover its response costs from other responsible parties and to pay the State 75% of the proceeds from the recovery. This lawsuit, filed in 1992, seeks such recovery.

In 1990–91, the Town's consultant, EA Engineering Science and Technology, performed a Remedial Investigation Feasibility Study ("RI/FS"). Following its review of the final RI/FS, in October, 1991, the State issued its Record of Decision ("ROD"), which outlined the State's chosen remedy for the landfill. The remedial action was implemented in 1992–93. The Town has spent approximately $5 million, and under existing 30–year monitoring requirements, will spend an additional $3 million in response costs. The Town has received funds of approximately $3.5 million in EQBA aid from the State. The Town seeks these costs as necessary costs of response from the defendants.

In Motion #1, the movants seek summary judgment dismissing the complaint in its entirety on the grounds that (1) the costs incurred by the Town in complying with its obligations under state law are not CERCLA response costs, (2) the Town's closure of the landfill was neither "necessary" nor "consistent with the national contingency plan" as required by CERCLA, and (3) the Town's common law claim for public nuisance is time barred.

In Motion #2, the Town moves to amend the complaint to add Kollmorgen, Mearl and Coke–NY as defendants, arguing that joinder at this stage in the litigations is proper because these third-party defendants cannot demonstrate bad faith on the part of the Town or undue prejudice from the amendment.

---

**2.** To provide assistance to financially strapped towns responding to the threats posed by inactive hazardous waste sites, the EQBA appropriated $1.2 billion. Pursuant to Environmental Conservation Law § 27–1313(5)(g), the Commissioner of the DEC is authorized to enter into agreements with municipalities implementing re-medial programs at municipally owned inactive hazardous waste sites. Pursuant to such an agreement, the Commissioner may obligate the State to reimburse with EQBA funds up to 75% of the cost incurred by a municipality in the course of its remediation.

In Motion # 3, the State moves to amend its pleading to realign as a party plaintiff so that it can assert its own claims against certain parties for its costs in reimbursing the Town and in overseeing the remediation of the landfill.

In Motion # 4, the United States moves to dismiss the Town's § 107 claim. It argues that because the Town is a responsible party or a potentially responsible party, its claims are for contribution under § 113(f), not claims on which joint and several liability may be imposed pursuant to § 107(a)(4). The United States argues that because defendants/third-party plaintiffs face liability on the Town's claims only for their allocable share of the CERCLA response costs incurred by the Town and do not risk incurring liability for any amount in excess of their allocable shares, they do not themselves have contribution claims against the third-party defendants, and thus third-party claims and cross-claims for contribution are unavailable as a matter of law in this action.

**THE STATUTORY FRAMEWORK**

 In 1980, Congress passed CERCLA to provide the tools necessary for a prompt and effective response to problems resulting from hazardous waste disposal, and to force those responsible for creating harmful conditions to bear the costs of remediation. See *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir.1992). Because it is a remedial statute, CERCLA must be construed liberally to effectuate its two primary goals. *B.F. Goodrich*, 958 F.2d at 1198. Liability under CERCLA is strict, see *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 (2d Cir.1985), and joint and several, if the environmental harm is indivisible. See *B.F. Goodrich Co.*, 958 F.2d at 1198.

CERCLA establishes four classes of responsible parties liable for the costs of responding to releases or threatened releases of hazardous substances. These include past and present owners or operators of facilities, transporters of hazardous substances, and those who generate or arrange for the disposal or treatment of hazardous substances. 42 U.S.C. § 9607(a).

Section 107(a)(4) of CERCLA provides, in pertinent part, that a responsible person shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; ...

§ 107(a)(4)(A) and (B), 42 U.S.C. § 9607(a)(4)(A) and (B).

In 1986, Congress passed the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), P.L. 99–499, 100 Stat. 1613, adding §§ 113(f) and (g), 42 U.S.C. §§ 9613(f) and (g).[3] Sections 113(f)(1) and (2) provide a private right of action for contribution and contribution protection for parties settling with the United States government or a State.

Section 113(f) provides, in pertinent part:

(1) Contribution

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

(2) Settlement

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not dis-

---

**3.** Section 113(g)(3) created a three-year statute of limitations for contribution claims, and § 113(g)(2) created a six-year statute of limitations for cost recovery actions.

charge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

§ 113(f)(1) and (2), 42 U.S.C. § 9613(f)(1) and (2).

## DISCUSSION

### 1. *Motion # 1*

a. *Whether the Town may recover under CERCLA when its costs would have had to have been incurred simply to bring the Landfill into compliance with ordinary state landfill closure requirements*

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court's responsibility is to perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos,* 831 F.Supp. 1079, 1082 (S.D.N.Y.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1985)); *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See *McNeil,* 831 F.Supp. at 1082 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam) (other citations omitted)). See also *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991) (citation omitted).

■ Liability under CERCLA is imposed where a plaintiff establishes the following five elements: (1) the defendant falls within one of the four categories of "responsible parties" enumerated in § 107(a); (2) the site of the clean-up is a facility under 42 U.S.C.

§ 9601(9); (3) there is a release or threatened release of hazardous substances at the facility; (4) as a result of which plaintiff has incurred response costs; and (5) the costs incurred conform to the national contingency plan ("NCP") under § 107(a)(4)(A) as administered by the EPA. See *U.S. v. Alcan Aluminum Corp.,* 990 F.2d 711, 719–720 (2d Cir.1993) (*citing B.F. Goodrich Co.,* 958 F.2d at 1198). The movants argue here that the absence of material issues of fact on the third, fourth and fifth elements entitled them to summary judgment dismissing the Town's CERCLA claims.

■ Relying on *Barnes Landfill, Inc. v. Town of Highland,* 802 F.Supp. 1087 (S.D.N.Y.1992) and *City of Seattle v. Amalgamated Servs.,* 1994 WL 869839 (W.D.Wash.), the movants argue that the Town has not shown a release or threatened release of a hazardous substance that has "caused" it to incur response costs. They argue that the Town has failed to establish "causation" because the Town would have had to incur these costs simply to comply with ordinary landfill closure and maintenance regulations under Part 360 of the New York Code of Rules and Regulations, 6 ("Part 360"). They assert that four of the six "remedial actions" required by the ROD constitute requirements imposed on the Town by Part 360, and argue, therefore, that even if the landfill contained no hazardous substances, the Town would still have been obliged to undertake these actions and incur these costs to bring the landfill into compliance with Part 360. The movants conclude that the Town's costs were not caused by a release or threatened release of hazardous substances, but by its obligation to comply with state closure and maintenance requirements.

In *Barnes,* defendants moved to dismiss plaintiff's CERCLA claim on the grounds that the plaintiff failed to allege a release or threatened release of hazardous substances or to allege that it incurred response costs as a result of the release or threatened release. The court granted the motion on grounds of "vagueness" holding that plaintiff's allegations of a release or threatened release did not provide any defendant with adequate no-

tice of its potential liability, and plaintiff's allegation that it had incurred costs in response to the release of hazardous substances was conclusory. The court explained:

It is only costs caused by the hazardous substance response for which defendants can be held liable under federal law. Ordinary closing or clean-up costs not pertaining to hazardous substances, incurred under state law or otherwise, would not be a basis for holding defendants responsible under CERCLA.

*Barnes,* 802 F.Supp. at 1088.

In *City of Seattle,* defendants moved for summary judgment to exclude the costs of meeting state and local standards for landfill closure from a liability action under CERCLA. The court granted the motion:

Any actions [plaintiff] was already obligated to take to meet [state and local regulations] were not caused by the escape of hazardous substances. Only costs incurred to meet additional requirements cause [sic] by the escape of hazardous substances, or listing as a Superfund site, qualify as necessary response costs.

*City of Seattle,* 1994 WL 869839 at *2.

To the extent *Barnes* or *City of Seattle* might be read to stand for the proposition that the Town's compliance with state regulations in responding to the release or threatened release precludes liability under CERCLA, they are anomalous. Other courts have specifically rejected the argument that compliance with state regulations precludes CERCLA liability as a matter of law. See *Arizona v. Motorola,* 805 F.Supp. 742, 748 (D.Ariz.1992) ("It would be contrary to CERCLA's intentions to provide that a responsible defendant cannot be held liable where an appropriate remedy contained any provisions identical to landfill closure ... requirements."); *City of Fresno,* No. CV–F–93–5091 at 4 n. 1, 1995 WL 641983 (rejecting argument that compliance with state regulations precludes CERCLA coverage as matter

of law because CERCLA requires that remedial actions satisfy state and local law); *Town of Wallkill v. Tesa Tape, Inc.,* 891 F.Supp. 955, 960 (S.D.N.Y.1995) ("[u]nder Section 107(a), liability attaches if a release or threatened release 'causes' incurrence of *some* response costs; it does not require that such a release cause *all* of the response costs which the Town seeks to recover.").

The Town's alleged history of noncompliance with state regulations also does not foreclose liability. "CERCLA is a strict liability statute, with only a limited number of statutorily-defined defenses available. The defenses are that the release was caused solely by an 'act of God [or] war,' or that the release was caused solely by a third party whose actions were not foreseeable by the defendant, who was exercising due care with respect to the hazardous substance." *General Electric Co. v. Litton Industrial Automation Systems, Inc.,* 920 F.2d 1415, 1418 (8th Cir.1990) (citing 42 U.S.C. § 9607(b) (other citations omitted), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991)). Courts have held that the impetus behind a plaintiff's decision to begin the cleanup process is irrelevant to a determination of liability. See *General Electric Co.,* 920 F.2d at 1418 ("CERCLA does not provide for an 'unclean hands' defense.... Thus, the motives of the private party attempting to recoup response costs ... are irrelevant."); *Town of Wallkill,* 891 F.Supp. at 960 ("noncompliance with state regulations does not preclude CERCLA liability.").

*Barnes* and *City of Seattle* are also contrary to other decisions to the extent they hold that, as a matter of law, costs incurred to meet state and local closure and maintenance requirements cannot be recovered under CERCLA.[4] For example, in *City of Fresno v. NL Indus., Inc.,* No. CV–F–93–5091, 1995 WL 641983 (E.D.Cal. January 19, 1995), the court expressly rejected the holding of *City of Seattle:* "This court will not hold that, as a matter of law, defendants cannot be held liable for closure costs of

---

**4.** *Barnes* is also unpersuasive because it involved a Rule 12(b)(6) motion to dismiss for failure to state a claim. The language quoted above was part of the court's ruling on the sufficiency of the plaintiff's allegations as to whether its response

costs were incurred as a result of a release or threatened release, and thus, is not conclusive on the issue of whether costs incurred in complying with state and local regulations must be excluded from any recovery.

Fresno landfill incurred by the City in compliance with State regulations." Rather, it held that

> the determination of recoverable costs depends on the facts surrounding the closure of the particular landfill at issue. For instance, all landfills may need to close one day, but the presence of hazardous substances may require it to close prematurely or in a different manner so that closure in a particular case is in response to the presence of hazardous substances rather than ordinary landfill maintenance.

*City of Fresno,* No. CV–F–93–5091 at 4 n. 1. See also *Town of Wallkill,* 891 F.Supp. at 961 ("The issue of the Town's· compliance, or noncompliance, with the closure requirements of New York State seems relevant, at most, to the apportionment of the damages, or a limitation on the amount of damages recoverable. This involves factual questions …").

Moreover, *Barnes* reached its decision on this issue without analysis and without citing any relevant authority and *City of Seattle* relied on *Barnes.* Neither decision discusses the significance of the fact that CERCLA expressly requires adherence to state environmental regulations that may be more stringent than federal law. 42 U.S.C. § 9621(d)(2)(A). In fact, liability under CERCLA may only be imposed where the costs incurred conform to the NCP, see *Alcan Aluminum Corp.,* 990 F.2d at 719–720, which specifically requires that cleanups comply with "applicable or relevant and appropriate requirements" of state law. 40 C.F.R. §§ 300.430(e)(9)(iii)(B), (f)(1)(i)(A). Because CERCLA requires compliance with other applicable statutes and regulations, it would be illogical to conclude that as a matter of law a plaintiff could not recover costs associated with an appropriate remedy that included actions required by otherwise applicable state statutes and regulations.

In this regard, courts have specifically held that recovery under CERCLA may *include* "removal" and "remedial action" conducted pursuant to other laws, including state law. For example, in *United States v. Rohm and Haas Company,* 2 F.3d 1265, 1274–75 (3d Cir.1993), the court held that the costs of overseeing removal were recoverable under CERCLA, regardless of whether the removal was undertaken pursuant to CERCLA or the Resource Conservation and Recovery Act. The court explained:

> Section 107(a) expressly stipulates that 'all costs of removal' … incurred by the United States Government are recoverable, and neither it nor the definition of 'removal' contains CERCLA specific language. 42 U.S.C. §§ 9601(23), 9607. Moreover, § 107(a) expressly provides for the situation in which more than one statutory scheme purports to provide a governing rule. The opening clause—'notwithstanding any other provision or rule of law'—decrees that where another statute, as well as § 107(a), is applicable, the liability provisions of § 107(a) will prevail even where the commands of the two statutes are in conflict.

*Rohm and Haas Company,* 2 F.3d at 1274. See also *State of Colo. v. U.S.,* 867 F.Supp. 948, 952–53 (D.Colo.1994) (holding recovery of costs may be available under CERCLA despite applicability of state regulations if actions taken pursuant to state regulations independently meet definition of "removal" or "remedial action" under CERCLA).

Here, the Town has submitted some credible evidence that a release or threatened release of hazardous substances caused it to incur response costs, creating a genuine issue of material fact. Field investigations and sampling in the 1980's established the presence of hazardous wastes at the landfill and the landfill was deemed by DEC a significant threat to public health or the environment. See Cozzy Declaration ¶ 13. In 1986, NYSDEC listed the landfill on the State Inactive Hazardous Waste Disposal Site Registry. See Cozzy Declaration ¶ 13; Town's Exhibit 1. In 1989, DEC served the Town with the Consent Order, which required that the site be remediated in accordance with 6 NYCRR Part 375, the state regulations governing inactive hazardous waste disposal sites. See Rea Declaration ¶ 9; Samuelian Affidavit ¶ 3; Cozzy Declaration ¶ 15; Town's Exhibit 2.

The Town performed a RI/FS, a remedial study required by state law only at hazard-

ous waste sites. See Samuelian Affidavit ¶¶ 1, 4; Town's Exhibit 5. After considering alternative remedies from the RI/FS, the State issued its ROD, outlining the selected remedy the landfill. See Cozzy Declaration ¶ 19, Samuelian Affidavit ¶ 11; Town's Exhibit 7. That remedial action required compliance with a long list of State and Federal regulations. See Cozzy Declaration ¶ 18; Town's Exhibit 7. The Town, under the state's supervision, has implemented the remedy and continues to monitor the site in accordance with the ROD. See Cozzy Declaration ¶ 20.

Because the Town's compliance or noncompliance with state law does not preclude liability under CERCLA, costs incurred in complying with other laws, including state law, may constitute CERCLA response costs, and, there is a genuine issue of material fact as to whether there was a release or threatened release as a result of which the Town incurred response costs, the motion to dismiss the CERCLA claim on the grounds that the Town has not incurred costs caused by a release or threatened release of hazardous substances is denied.

b. *Whether the Town's closure of the landfill was "necessary" or "consistent with the national contingency plan" as required by CERCLA*

■ Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607, provides in pertinent part:

any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities … from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for … any … necessary costs of response incurred by any other person consistent with the national contingency plan.

42 U.S.C. § 9607(a)(4)(B).

The movants argue that to demonstrate that costs are "necessary" and "consistent

with the national contingency plan," a plaintiff must show that the release or threatened release of a hazardous substance posed a *substantial* danger to human health or the environment. CERCLA does not define the terms "necessary" and "consistent with the national contingency plan," but it does define "remedial actions" as "those actions consistent with [a] permanent remedy taken … to prevent or minimize … a substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24). In addition, CERCLA limits the scope of NCP-authorized remedial actions to sites posing a substantial danger to the public health or the environment. See 42 U.S.C. § 9605(a)(2) (the NCP shall establish "methods for evaluating … and remedying any releases or threats of releases from facilities which pose substantial danger to the public health or the environment."). Moreover, the NCP specifies that private parties must extensively investigate the site before devoting the time and money required for a CERCLA remedial action, see 40 C.F.R. § 300.700(c)(5), and "eliminate from further consideration those releases that pose no significant threat to public health or the environment." 40 C.F.R. § 300.420(c)(1)(i).

Citing *Rhodes v. County of Darlington,* 833 F.Supp. 1163 (D.S.C.1992), and *G.J. Leasing Co. Inc. v. Union Electric Co.,* 854 F.Supp. 539 (S.D.Ill.1994), *aff'd,* 54 F.3d 379 (7th Cir.1995), the movants argue that the Town here has failed to demonstrate that a release or threatened release posed a *substantial* danger to human health or the environment, and thus its alleged response costs were neither "necessary" nor "consistent with the national contingency plan."

In support of their claim, the movants rely upon admissions by the Town's Supervisor, and the Town's consultant, that the risk assessment for the landfill did not disclose any risk warranting a CERCLA remedial action.[5]

5. In his statement on the Town's "Landfill Remedial Action Plan," the Town Supervisor stated: The level of risks associated with this site are similar to a person smoking 1.4 cigarettes once in a lifetime *or* drinking one pint of wine *or* traveling three hundred (300) miles in a car. Thus, the dump could remain in its present

condition without being a significant threat to the citizens of New Windsor. However, the State has minimum closure standards to which our site must comply.
Movants Exhibit 9.
In its August 1990 fact sheet, the Town's consultant stated that "the site does not represent a

In addition, they rely upon the testimony of Robert Harris, an expert in risk assessment.[6] They argue that the evidence conclusively demonstrates that the Town and its consultants characterized risks as "unacceptable" merely to create a CERCLA claim and thereby recover from defendants its ordinary landfill closure and maintenance costs. They argue that neither the Town nor the State made any evaluation of the quantum of risk posed by the landfill, that the evidence demonstrates that the risks were extraordinarily small, that the exposure assumptions necessary to generate the nominal risks were extraordinarily "conservative" and did not represent "actual risks," and that even then essentially all of the risks were within the range of risks deemed acceptable by the EPA after cleanup at Superfund sites.

The Town, however, disputes both the accuracy and the significance of this evidence. The Town asserts that the Supervisor's statement and the August 1990 fact sheet were later abandoned by the Town, following additional field investigation and sampling. In his affidavit, John Samuelian, who served as project manager for the RI/FS, asserts that these admissions were based on a draft risk assessment and that subsequent results from Phase II sampling compelled the Town's consultant and the Town to change their conclusion. He states that the risk assessment did identify unacceptable carcinogenic risks and unacceptable noncarcinogenic risks, and in July 1991, the Town issued a fact sheet, identifying the risks associated with the landfill in its unremediated state. See Samuelian Affidavit ¶ 27–30; Town's Exhibit 12. Mr. Samuelian also refutes portions of Mr. Har-ris' deposition testimony. See Samuelian Affidavit ¶¶ 14–30.[7]

Moreover, the Town argues that even if had come to the conclusion that the landfill did not pose a risk to human health or the environment, the State determined the necessity of remedial action under CERCLA. The DEC deemed the site a significant threat to public health or the environment, and in 1986, listed the landfill on its registry as an Inactive Hazardous Waste Site. See Cozzy Declaration ¶ 13; Town's Exhibit 1. The State issued a Proposed Remedial Action Plan in August 1991, which stated "[a]ctual or threatened releases of hazardous substances from this site, if not addressed by implementing the response action described in this [plan], present a current or potential threat to public health, welfare, and the environment." Town's Exhibit 6. On the basis of the risk assessment which was prepared in accordance with EPA guidelines, the State issued its ROD finding that the site was a facility from which there had been a release or threat of release of hazardous substances. See Samuelian Affidavit ¶¶ 11, 15, 23–26; Town's Exhibit 7.

The movants argue that although the DEC deemed the landfill a significant threat to human health and the environment and listed it on the State's Registry of Inactive Waste Sites, the decision to do so was based solely on "the presence of hazardous wastes" at the site, rather than on any evaluation of the hazard posed by the site. They point out that in 1989, the New York Court of Appeals struck down DEC regulations under which "the mere presence [of hazardous wastes] would automatically support a 'significant threat' determination." *New York State Su-*

---

hazard to the public health." Movants' Exhibit 10. Movants have offered a later draft fact sheet, allegedly produced after the risk assessment was completed in July 1991, which included this admission, but had been crossed out by the Town and its consultants with a notation in the margin stating "we can't say this & still pay for it!" Movants' Exhibit 11.

**6.** Mr. Harris allegedly stated at his deposition that the risk assessment for the landfill did not document a significant risk to human health or the environment nor support remediation at the landfill. Movants did not include Mr. Harris' deposition in their papers.

**7.** In their reply brief, the movants argue that Mr. Samuelian's affidavit does not create an issue of fact because it is conclusory and the underlying documents from Phase I and Phase II do not support Mr. Samuelian's statement that Phase II "supplementary sampling activities" compelled EA Engineering to change its "no hazard" conclusion. The Town argues, however, that the Phase II field work sampling results referred to by Dr. Samuelian are contained in the RI/FS documents themselves, which substantiate unacceptable carcinogenic and non-carcinogenic risks associated with human exposure to hazardous substances.

*perfund Coalition, Inc. v. DEC,* 75 N.Y.2d 88, 93, 550 N.Y.S.2d 879, 881, 550 N.E.2d 155, 157 (1989). In addition, they argue that a 1986 "significant threat" decision cannot support a remedial action taken after a 1991 risk assessment demonstrating that the site presented "no hazard."

Clearly there are genuine and somewhat technical issues of material fact here as to, for example, whether the landfill posed a risk to human health or the environment, the magnitude of that risk, what were the results of the RI/FS, and what is the meaning of the DEC's deeming the landfill a significant threat and listing it on its registry as an Inactive Hazardous Waste Site. Because the Town has offered some evidence in the form of affidavits and exhibits on each of these issues, this Court cannot conclude as a matter of law that the Town's response costs were not "necessary" or not "consistent with the national contingency plan." Accordingly, the motion to dismiss the CERCLA claim on the grounds that the Town has failed to show that its costs were "necessary" and "consistent with the national contingency plan" is denied.

■ In their reply brief, the movants submit that if the Court declines to grant complete summary judgment, it should grant partial summary judgment, in the form of a declaratory judgment that certain identifiable and divisible categories of alleged response costs are not recoverable because they indisputably were not caused by any release or threatened release. The movants argue that such categories of costs include future monitoring costs and encroachment remediation costs. Because there is no precedent for such a ruling, the issue was raised only in reply, and this sort of allocation of costs, relating to the equitable determination of the amount of damages attributable to each defendant, is more appropriately addressed when liability has been established, the movants' request is denied as premature.

### c. Whether the Town's common law claim for public nuisance is barred by the statute of limitations

■ Movants argue that the Town's nuisance claim is governed by New York Civil Practice Law and Rules § 214–c, which provides for a three year statute of limitations in actions for injury to property caused by the latent effects of exposure to any substance from the date of discovery of the injury.[8] It is undisputed that the Town discovered the alleged injury by January of 1989, at the latest, when it executed the Consent Order. The Town filed its complaint in December 1992.

In opposition, the Town argues that its nuisance claim is governed by CPLR § 214(4), which provides that an action to recover damages for injury to property must be commenced within three years.[9] CPLR § 214(4) was moderated by a common law "daily accrual" doctrine, which provides that "continuous injuries to [property] caused by the maintenance of a nuisance ... create separate causes of action barred only by the running of the statute against successive trespasses." *Jensen v. General Electric Company,* 82 N.Y.2d 77, 85, 603 N.Y.S.2d 420, 423, 623 N.E.2d 547, 550 (1993) (internal quotations and citations omitted). Pursuant to this doctrine, the Town argues that, because the harm in this nuisance action continued until the nuisance was abated in 1993, it is entitled to recover damages during the three years prior to the commencement of this action.

In *Jensen,* however, the New York Court of Appeals, in an action for damages based

---

8. Section 214–c provides, in pertinent part: Notwithstanding the provisions of section 214, the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property must be commenced shall be computed from the date of discovery of the injury by the plaintiff of from the date when through the exercise of reason-

able diligence such injury should have been discovered by the plaintiff, whichever is earlier.
CPLR § 214–c(2).

9. Section 214 provides, in pertinent part: "The following actions must be commenced within three years: ... an action to recover damages for an injury to property except as provided in section 214–c." CPLR § 214(4).

on continuing trespass and nuisance, held that the newly enacted § 214–c displaced the common law "daily accrual" doctrine. The court explained that, prior to the enactment of CPLR 214–c(2), the statute of limitations began to run as of the date of exposure, regardless of the date on which the injury was discovered. The common law "daily accrual" doctrine evolved to ameliorate the harshness of this rule with respect to continuous wrongs.

The court reasoned that the enactment of § 214–c essentially repealed the "archaic" date-of-exposure rule and replaced it with a "fair and simple" date-of-discovery rule. *Jensen*, 82 N.Y.2d at 84 (quoting Governor Mario Cuomo, Approval Memorandum, 1986 N.Y.Legis.Ann., at 288). The court observed that "[t]he Legislature presumably ... understood that its dramatic new rule of accrual, expressed as governing property damage actions due to the latent effects of exposure from any substance, was displacing the rationale for the common-law exception." *Jensen*, 82 N.Y.2d at 86.

Attempting to distinguish *Jensen*, the Town argues that the scrapping of the "daily accrual" rule was limited to private nuisance actions. It is undisputed that the Town's action is for a public nuisance. In support of its position that the "daily accrual" rule still applies to continuous public nuisance claims, the Town relies upon *State of New York v. General Electric Company*, 199 A.D.2d 595, 604 N.Y.S.2d 355 (3d Dept.1993), decided one month after *Jensen*. In *General Electric Company*, the court held that "a public nuisance is a continuing harm," and applied the "daily accrual" doctrine to hold that damages were recoverable for the three years immediately prior to the Town's commencement of the action. *General Electric Company*, 199 A.D.2d at 598, 604 N.Y.S.2d 355 (citing *Kulpa v. Stewart's Ice Cream*, 144 A.D.2d 205, 207, 534 N.Y.S.2d 518 (3d Dept.1988)).

The Town's argument fails for a number of reasons. (1) *Jensen* fails to support the Town's claim that it was limited to private nuisance actions. In fact, the opposite is true. *Jensen*'s language is expansive, rather than limiting: "the Legislature knew that it was altering the accrual date for all property damage actions caused by all substances, including those emanating from a continuing trespass and continuing nuisance condition, and intended that alteration." *Jensen*, 82 N.Y.2d at 84–85, 603 N.Y.S.2d at 423, 623 N.E.2d at 550. (2) *General Electric Company* does not distinguish its holding from *Jensen* on the grounds that it was an action for public nuisance. In fact, there is nothing to indicate that it was even aware of *Jensen*. The Town's argument that *General Electric Company* upheld a distinction between public and private nuisance claims is further belied by the fact that it cited only one case, *Kulpa*, which applied the "daily accrual" rule in a private nuisance action. (3) Although the Town provides an elaborate history of the distinction between public and private nuisance actions, it does not suggest any reason why the distinction would warrant a different statute of limitations.

Accordingly, the motion to dismiss the Town's common law nuisance claim as time barred is granted.

### 2. *Motion # 2*

 In Motion # 2, the Town moves, under Rule 15, to amend the First Amended Complaint to add Kollmorgen, Mearl and Coke–NY [10] as defendants.[11] Rule 15 would permit this amendment absent a showing of bad faith, futility or undue prejudice. See *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993). Mere delay, absent bad faith or undue prejudice, does not provide a basis for denial of leave to amend, but "the longer the period of an unexplained delay, the less will be required of the nonmoving party in terms

**10.** After the Town served its motion, it settled its claims with Coke–NY. Thus, Coke–NY does not oppose the motion.

**11.** Rule 15 provides in pertinent part that after a responsive pleading has been served "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a).

of a showing of prejudice." *Block,* 988 F.2d at 350.

In determining prejudice, the main factors to consider are "whether the assertion of the new claim would: (1) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (2) significantly delay the resolution of the dispute; or (3) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block,* 988 F.2d at 350.[12]

Kollmorgen and Mearl argue that the Town has failed to show a valid reason for its delay. They assert that all evidence upon which the Town now relies to state a claim against them was readily available to the Town prior to December 1992. Relying upon a letter from counsel for the Town,[13] they argue that the Town made a calculated decision not to sue them in December 1992, and to transfer the "time, money and effort" of suing "more marginal defendants," like themselves, on the named defendants.

Two years elapsed between the filing of the original complaint and the Town's notifying Kollmorgen and Mearl of its intent to assert direct claims against them. The Town offers little to exculpate itself, except that it relied upon a stipulation, signed by all parties on December 16, 1994,[14] and that it specified the nature of its claims and supporting evidence through expert disclosure, written communications to the court and counsel, and in conversation with counsel, at least six months before the close of factual discovery.[15] The Town does not deny that it had all the information necessary for its proposed amendment from the start. The only explanation offered is that the motion to amend the complaint reflects a change in litigation strategy. "However, neither long delay nor the fact that a proposed amendment is motivated by an afterthought of counsel as to the best theory upon which to proceed, by themselves, suffice as reasons for denying leave to amend." *Green v. Wolf Corporation,* 50 F.R.D. 220, 223 (S.D.N.Y. 1970) (citing *Middle Atlantic Utilities Co. v. S.M.W. Development Corp.,* 392 F.2d 380, 384–85 (2d Cir.1968)).

Delay as a predicate for a finding of bad faith is a sufficient reason to deny leave to amend. See, e.g., *Vine v. Beneficial Finance Co.,* 374 F.2d 627, 637 (2d Cir.), *cert. denied* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d

---

12. In addition to the arguments discussed below, Mearl and Kollmorgen also argue that the applicable standard of review on this motion is the more stringent "good cause shown" required by Rule 16(b) of the Federal Rules of Civil Procedure. They assert that the Town must show "good cause" for amending the complaint to add them as defendants, because the Scheduling Order, dated November 22, 1994, implicitly incorporates a deadline of December 21, 1994, for motions to add additional defendants. Under Rule 16(b) of the Federal Rules of Civil Procedure, a scheduling order cannot be modified except upon a showing of "good cause."

The Scheduling Order, however, did not explicitly prescribe the time by which the Town was required to move to add parties to its complaint. It merely stated that by December 21, 1994, "third-party plaintiffs must serve affidavits with attached exhibits detailing the specific evidentiary bases for their claims against third-party defendants . . .; such affidavits will be preclusive as to the evidence proffered by third-party plaintiffs on those claims, except for good cause shown." Scheduling Order ¶ 6. Although Rule 16(b) provides that "the judge . . . shall . . . enter a scheduling order that limits the time . . . to join other parties and to amend the pleadings . . .," the Scheduling Order did not limit the time.

13. Before commencing suit, counsel for the Town advised the Town, in a letter date July 11, 1992, that "it is our recommendation that we file suit against Tuck, Lightron, Frye Copysystems and Newburgh Barrel and Drum. As is typically the practice in Superfund cases, the original defendants will then bring in as many third parties as possible. Rather than ligating against the more marginal defendants ourselves, we should sue the four major defendants and let them spend the time, effort and money to bring in other potentially responsible parties."

14. The stipulation provided that "all counter-claims, cross-claims and third-party claims that have been made, could have been made, or that could be made hereafter are deemed to have been made; and all such claims are deemed to have been answered and denied by the opposing party."

15. In addition, the Town asserts that the preclusive affidavits ordered by this Court on November 22, 1994 relied upon the Town's expert witness report, which had been served on December 15, 1994, and which specified the evidentiary bases for CERCLA liability against all the industrial generators, including Kollmorgen and Mearl.

460 (1967). Although the Town's excuse for delaying two years appears quite thin, the Court hesitates nonetheless to conclude that the Town is guilty of bad faith. The federal rules of pleading are not intended unreasonably to lock counsel into a litigation strategy. To the contrary, "the Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome, and accept the principle that the pleading is to facilitate a proper decision on the merits." *Foman,* 371 U.S. at 181–182, 83 S.Ct. at 230.

Kollmorgen and Mearl also argue they will be prejudiced if the Town's motion is granted because they have prepared for trial facing only contribution claims by third-party plaintiffs. Prejudice to an opposing party is "the usual area upon which courts focus when considering whether to permit an amendment." *Green,* 50 F.R.D. at 223 (citing *Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152 (2d Cir.1968)). Mearl argues that the Court ordered the preclusive affidavits to protect third-party defendants from unspecified claims by any party so that they could prepare for a speedy trial. If the Town is permitted to amend its complaint to add them as defendants, they may suddenly face claims for joint and several liability.[16]

Beyond conclusory statements that they would have conducted their pre-trial preparations and discovery differently, Kollmorgen and Mearl have not demonstrated what real prejudice would arise from the Town's proposed amendment. They have not shown that delay will ensue, or that evidence relevant to the Town's direct claims is no longer available. Nor have they alleged that discovery will have to be reopened or that additional motion practice will be required.[17] Accordingly, the Town's motion to amend its pleadings to add Kollmorgen and Mearl as defendants is granted.

■ In connection with the Town's motion, defendants have submitted a brief entitled "Memorandum of Law Regarding Plaintiff's Motion to Amend the Complaint." They do not appear to oppose the motion, but request that if the motion is granted, they be awarded the costs they incurred in retracing the Town's investigation of the parties that the Town now asserts are "indispensable parties," i.e., Kollmorgen and Mearl.

■ The Town correctly observes, however, that defendants have cited no authority for this proposal, and that attorneys fees and costs are generally not recoverable "absent explicit congressional authorization." *Runyon v. McCrary,* 427 U.S. 160, 185, 96 S.Ct. 2586, 2602, 49 L.Ed.2d 415 (1976). In addition, defendants have not attached an affidavit setting forth the costs incurred in investigating Kollmorgen and Mearl, above and beyond what they would have spent if Kollmorgen and Mearl had been joined as defendants from the start. Defendants' request for costs is denied.

### 3. *Motion # 3*

■ Motion # 3 is the State's motion to amend its pleading to realign as a party plaintiff, pursuant to Rule 15 of the Federal Rules of Civil Procedure. The State seeks to realign as a party plaintiff so that it can assert its own claims against certain parties for its costs (1) in reimbursing the Town and (2) in overseeing the remediation of the landfill.[18]

16. This concern of Kollmorgen and Mearl's in relation to the Town is rendered moot by this Court's decision on Motion # 4, but may remain viable in relation to the State in view of the Court's decision on Motion # 3.

17. They joined the summary judgment motion of Certain Defendants and Third Party Defendants (Motion # 1).

18. Frye (joined by the other interested parties) argues that the State's motion to amend is really a motion to intervene because, since the inception of this litigation, the State has acted only to defend the interest of the Department of Transportation as a potentially responsible landowner under CERCLA and has never served or answered discovery or appeared on behalf of any other state agency. Frye argues that the State's motion should therefore be assessed under Rule 24's more stringent standard.

Rule 24 of the Federal Rules of Civil Procedure provides that

upon timely application anyone may be permitted to intervene in an action: ... when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will

Defendants and Kollmorgen oppose the State's motion to amend on the grounds that the State's claims are futile. They correctly assert that prior to granting leave to amend, a court must examine the proposed claims to ascertain whether they are futile on their face. See *Love v. New York State Dept. of Envir. Conserv.*, 529 F.Supp. 832, 845 (S.D.N.Y.1981); *Barrett v. U.S. Banknote Corp.*, 806 F.Supp. 1094, 1098 (S.D.N.Y. 1992). Although defendants and Kollmorgen appear to have strong defenses to the State's claims, because the State's claims present issues of first impression, this Court cannot conclude that they are futile on their face.

Frye argues that the State has unduly delayed and that the delay will prejudice the other parties. The State, however, has not unduly delayed in seeking to realign as plaintiff. It was joined as a third-party defendant in March 1994 and timely filed its answer in June 1994. Moreover, this case is one of the first involving EQBA funding and has progressed further than any other EQBA case. Whether the Town or State has legal authority to recover that portion of the costs reimbursed by the State pursuant to the EQBA grant is one of first impression. The State asserts that the EQBA issue was raised by defendants only in mid–1994, as factual discovery was closing. Before the close of discovery, the State announced its intention to realign as plaintiff in order to recover its alleged "response" costs.[19]

In the cases cited by Frye in opposition to the State's motion, the application to amend/intervene was made after the close of evidence at trial, see *United States v. Pitney Bowes, Inc.*, 25 F.3d 66 (2d Cir.1994), or many months after a court-imposed deadline, see *New Spectrum Realty Services, Inc. v. Nature Company*, 42 F.3d 773 (2d Cir.1994); *State of New York v. Cedar Park Concrete Corp.*, 741 F.Supp. 494 (S.D.N.Y.1990); *H.L. Hayden Co. v. Siemens Medical Systems, Inc.*, 112 F.R.D. 417 (S.D.N.Y.1986). Here, there was no court-ordered deadline for amending the pleadings, and the State complied with the deadline for submitting letters to the Court identifying the grounds for its proposed motion to amend.

In addition, the other parties will not be unduly prejudiced by the State's realignment. First, if prohibited from realigning in this action, the State could file a new, separate action, which in all probability would be assigned to this Court as related to this action, if not consolidated with it. None of the parties have articulated any reason why two actions would be less burdensome than, or somehow preferable to, one action.

Second, the nonmovants argue that if the State is realigned as plaintiff, they will have to defend against claims for joint and several liability, rather than merely contribution. The Town, however, has asserted claims for both contribution and joint and several liability from the start of this case. Although nonmovants may have concluded that the Town's claim for joint and several liability would eventually be dismissed, they did so at their peril. In addition, an increase in defendants' exposure is not grounds for denying leave to amend. See, e.g., *Poloron Products, Inc. v. Lybrand Ross Bros. & Montgomery*, 72 F.R.D. 556, 561–62 (S.D.N.Y.1976).

unduly delay or prejudice the adjudication of the rights of the original parties.
Fed.R.Civ.P. 24(b).

Under Rule 24, the burden is on the proposed intervenor to file timely. To determine whether an application is timely, a district court considers: (1) the length of time the applicant knew or should have known of its interests before making the motion; (2) prejudice to the existing parties resulting from the applicant's delay; (3) prejudice to the applicant if the motion is denied; and (4) the presence of unusual circumstances militating for or against a finding of timeliness. See *Farmland Dairies v. Commissioner of the New York State Department of Agriculture and Markets*, 847 F.2d 1038, 1044 (2d Cir.1988).

Thus, under both Rule 15 and Rule 24, the reason for the State's delay in making its motion and the prejudice to existing parties resulting from that delay are factors for consideration. This Court finds that, for the reasons stated in the opinion, whether the motion is characterized as one to amend under Rule 15 or to intervene under Rule 24, the State has met its burden to file timely and defendants have not shown futility, bad faith or undue prejudice.

**19.** The State submitted a letter *precis*, dated January 31, 1995, to this Court stating its intention to amend its pleadings to realign as a party plaintiff.

Third, the nonmovants argue that the burden of proof will change if the State is permitted to realign.[20] However, what burden of proof would apply has been somewhat unclear throughout this litigation, and only put to rest by this decision, because the Town has maintained that it should be considered a "state" for purposes of § 107(a)(4)(A).

Finally, the nonmovants argue that if the State is permitted to realign, discovery would have to be reopened and additional motion practice would delay the resolution of this case. The State concedes that limited fact discovery would be needed on its claim for oversight costs. It has, however, attached all the documents supporting this claim to the Notice of Motion. In addition, although it asserts that the documents will likely suffice (since the parties chose not to depose anyone in connection with the response costs incurred by the Town, but relied exclusively on the documents), it will make available any DEC staff member for deposition so as not to delay trial.

This Court is mindful that in all probability discovery will have to be reopened to some extent in connection with the State's claim for its costs in reimbursing the Town. Only one State employee, a former DEC Project Manager for the remedial investigation phase of the landfill closure, has been deposed. In addition, the Court recognizes that granting the State's motion will probably result in some additional motion practice. Although courts have held that the need for additional motion practice is a factor to consider in evaluating the prejudice to nonmovants, see, e.g., *H.L. Hayden Co.*, 112 F.R.D. 417, the Second Circuit has also held that the "purpose of the federal rules is to provide for a full and fair hearing on the merits. The burden of further discovery and motions is not a satisfactory basis to deny a motion to amend." *Middle Atlantic Utilities Co.*, 392 F.2d at 386.

Accordingly, in an effort to provide a hearing on the merits of this action, the State's motion to amend its pleadings to realign as a party plaintiff is granted.

### 4. *Motion # 4*

a. *Whether a CERCLA § 107(a)(4)(B) claim for joint and several liability against defendants is available to the Town*

Motion # 4 is the United States' motion to dismiss the Town's § 107 claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Town vigorously opposes Motion # 4, arguing that (1) a PRP, such as itself, is not limited to claims for contribution under § 113, but may proceed under § 107(a)(4)(B) to impose joint and several liability; (2) it is a "state" for purposes of CERCLA § 107(a)(4)(A); and (3) liability under § 113 is joint and several. The Town argues that if it is limited to contribution claims, it will not be able to recover the allocable shares of insolvent or otherwise judgment-proof PRPs ("orphan shares"). In addition, as a policy matter, it argues that if PRPs are limited to contribution claims, those PRPs otherwise amenable to initiating cleanup voluntarily will prefer to sit back and wait merely to defend against a contribution claim, frustrating CERCLA's goal of encouraging expeditious cleanups and imposing costs on responsible parties.

The United States argues that because the Town is a responsible or potentially responsible party, its claims are for contribution only. The United States relies on a line of cases holding that under CERCLA responsible or potentially responsible parties may bring claims for contribution only. See, e.g., *United States v. Colorado & Eastern Railroad Company ("CERC")*, 50 F.3d 1530 (10th Cir. 1995); *United Technologies v. Browning-Ferris Industries*, 33 F.3d 96 (1st Cir.1994), cert. den., —— U.S. ——, 115 S.Ct. 1176, 130

---

**20.** Where a private party undertakes remedial action, it must prove the costs incurred were "necessary" and "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). Where the federal or state government undertakes remedial action, it must prove the costs incurred are not "inconsistent" with the NCP.

42 U.S.C. § 9607(a)(4)(A). Thus, the standard for private party cost recovery actions is more demanding than the standard for cost recovery actions initiated by the State or EPA. See *State of New York v. General Electric Co.*, 592 F.Supp. 291, 303–04 (N.D.N.Y.1984).

L.Ed.2d 1128 (1995); *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761 (7th Cir.1994); *Reichhold Chemicals v. Textron, Inc.*, 888 F.Supp. 1116 (N.D.Fla.1995); *Ekotek Site PRP Committee v. Self*, 881 F.Supp. 1516 (D.Utah 1995); *T H Agriculture & Nutrition Co. v. Aceto Chemical Co.*, 884 F.Supp. 357 (E.D.Cal.); *Kaufman and Broad–South Bay v. Unisys Corp.*, 868 F.Supp. 1212 (N.D.Cal. 1994); *Transtech Industries, Inc. v. A & Z Septic Clean*, 798 F.Supp. 1079 (D.N.J.1992), *appeal dism.*, 5 F.3d 51 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2692, 129 L.Ed.2d 823 (1994); *Ciba–Geigy Corp. v. Sandoz Ltd.*, 1993 WL 668325 *7 (D.N.J. 1993).

However, the Town's position that a PRP may maintain a § 107(a)(4) action, concurrent with a claim for contribution under § 113(f), is also well-supported by the case law. See, e.g., *Town of Wallkill*, 891 F.Supp. 955; *United States v. SCA Services of Indiana, Inc.*, 849 F.Supp. 1264 (N.D.Ind.1994), *rec'n denied*, 865 F.Supp. 533 (N.D.Ind.1994); *Companies for Fair Allocation v. Axil Corp.*, 853 F.Supp. 575 (D.Conn.1994); *Barton Solvents v. Southwest Petro–Chem, Inc.*, 1993 WL 382047 (D.Kan.); *Chesapeake and Potomac Tel. Co. v. Peck Iron and Metal Co., Inc.*, 814 F.Supp. 1269 (E.D.Va.1992); *Allied Corp. v. Acme Solvents*, 691 F.Supp. 1100 (N.D.Ill.1988); *Chemical Waste Management, Inc. v. Armstrong World Industries, Inc.*, 669 F.Supp. 1285 (E.D.Pa.1987); *Pinole Point Properties, Inc. v. Bethlehem Steel Corp.*, 596 F.Supp. 283 (N.D.Cal.1984); *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135 (E.D.Pa.1982).

The Town distinguishes the line of cases relied upon by the United States as "contribution protection" cases. In those cases, a responsible or potentially responsible party brought a cost recovery action under § 107 against a party that had already settled its liability with the government. Because the defendant had settled, § 113(f)(2) barred the plaintiff from bringing a claim for contribution. Thus, in order to prevent the plaintiff from circumventing § 113's contribution bar by bringing an action under § 107, those courts, the Town argues, felt compelled to hold that a plaintiff PRP was limited to

claims for contribution. Because none of the defendants here have settled with the government, the Town argues that this Court need not be concerned with circumvention of § 113(f)(2).

The Town's distinction finds expression in the case law. Courts have categorized the cases cited by the United States as "contribution protection" cases, in which a § 107 claim threatened to undermine the contribution protection features of § 113(f)(2). These courts have held that in cases where defendants have not settled, the goals of protecting settling parties and encouraging parties to initiate cleanup operations promptly and voluntarily are not in competition, and thus, a PRP plaintiff should be permitted to proceed with a § 107 action. See, e.g., *Axil Corp.*, 853 F.Supp. at 579–580; *SCA Services*, 849 F.Supp. at 1275, 1281; *Barton Solvents*, 1993 WL 382047 at *4; *Town of Wallkill*, 891 F.Supp. at 959.

These courts reason that the plain language of § 107(a)(4)(B), "any other person," is expansive rather than limiting. They explain that § 107(a)(4)(B) does not say, as the United States contends, that any other *innocent* person is entitled to seek recovery for costs, but rather "any other person." See, e.g., *Axil*, 853 F.Supp. at 580; *Allied Corp.*, 691 F.Supp. at 1119. Moreover, these courts note that the language of § 113 does not suggest that it and § 107 provide mutually exclusive remedies. See, e.g., *SCA Services*, 849 F.Supp. at 1281.

The Town argues that these courts correctly recognized that permitting a PRP to maintain concurrent claims under §§ 107(a)(4) and 113(f) is consistent with CERCLA's goals of an expeditious cleanup with the costs borne by those parties responsible for dumping the waste. It argues that a PRP otherwise amenable to cleanup will be discouraged from voluntarily commencing the cleanup, "if it knows that, where the harm is indivisible, its only recourse for reimbursement is contribution from solvent PRPs." *Allied Corp.*, 691 F.Supp. at 1118; see also *Axil*, 853 F.Supp. at 579.

The Town's arguments, reflected in a long line of case, have some force. Ultimately, however, this Court finds the United States'

arguments and their supporting cases more persuasive for a number of reasons. First, the Town's primary concern that it will be left "holding the bag" on the orphan shares—and that future PRPs otherwise amenable to initiating cleanup will prefer to sit by and wait for the government or another PRP to do the work and spend the money, and then simply to defend against a § 113 contribution claim—is misplaced. Courts can use the powers provided by § 113(f)(1) to allocate any "orphan shares" among viable PRPs, with the result that each viable PRP's allocable share may include a portion of whatever "orphan shares" there are.

More importantly, however, the three very recent appellate opinions—*CERC, United Technologies, Akzo*—limiting responsible and potentially responsible parties to contribution claims rest on an interpretation of § 113(f)(1) that extends beyond the precise factual contexts in which the question arose.[21] Although this Court is mindful that a statute should be enforced "in such a manner that its overriding purpose will be achieved, even if the words used leave room for a contrary interpretation," *Capitano v. Secretary of Health & Human Services*, 732 F.2d 1066, 1075 (2d Cir.1984) (quoting *Haberman v. Finch*, 418 F.2d 664, 666 (2d Cir.1969)), we are not persuaded that it is sound to encourage different interpretations of the same CERCLA provision depending upon whether contribution protection, the statute of limitations, or liability is at issue in the case.

Section 107(a)(4)(B) must be read in conjunction with other sections of CERCLA, namely § 113(f) and its legislative history. The United States persuasively reasons that courts would not have struggled to find an implied right of contribution in § 107, see, e.g., *Ciba-Geigy Corp.*, 1993 WL 668325 at *6, and Congress would not have taken the trouble to codify the right of contribution in § 113(f), if a responsible or potentially responsible party all along had the right to seek to impose joint and several liability under § 107. See, e.g., *United Technologies*, 33 F.3d at 100–01.

Moreover, if a responsible or potentially responsible party were permitted to bring a claim for joint and several liability under § 107(a), which has a six year statute of limitations, the three year statute of limitations on § 113(f) claims would be eviscerated, because a party with a claim barred under § 113(f) could sue under § 107(a). See, e.g., *United Technologies*, 33 F.3d at 101. In addition, § 113(f)'s contribution bar would be rendered meaningless because § 113(f)(2) provides contribution protection only against claims for contribution. It is an inescapable conclusion that § 113(f)(2) bars only contribution claims because Congress intended that responsible and potentially responsible parties be able to bring *only* contribution claims.

This Court also concludes that the United States is correct that limiting responsible parties to contribution claims makes sense as a matter of policy. It will halt the ancillary litigation and third-, fourth-, and fifth-party practice that typically bogs down CERCLA litigation. See, e.g., *T H Agriculture & Nutrition Co.*, 884 F.Supp. 357, 361–62 (D.Cal. 1995); *Interstate Power Co. v. Kansas City Power & Light Co.*, 992 F.2d 804, 806 (8th Cir.1993). Reducing this sort of sequential, piecemeal litigation will further the goals underpining CERCLA by making cases more manageable, reducing transaction costs and enabling courts to perform CERCLA allocations of liability more efficiently.

### b. Whether the Town is a "state" for purposes of CERCLA § 107(a)(4)(A)

■ The Town also argues that it is a "governmental plaintiff" entitled to proceed pursuant to § 107(a)(4)(A). CERCLA provides separate provisions for cost recovery

---

**21.** Section 113(f) provides, in part, "[a]ny person may seek contribution from *any other* person *who is liable or potentially liable* under section 9607(a) of this title, during or following any civil action under section 9606 ... or ... 9607(a)...." § 113(f)(1), 42 U.S.C. § 9613(f)(1) (emphasis added). Courts have interpreted the "any other" language in § 113 to mean any person who is liable or potentially liable other than the plaintiff. See, e.g., *United Technologies*, 33 F.3d at 100; *Akzo*, 30 F.3d at 764. This interpretation supports the United States' position that the proper remedy by which a responsible or potentially responsible party can recoup its excess response costs from other is § 113(f).

actions brought by "the United States Government or a State," 42 U.S.C. § 9607(a)(4)(A), and for those brought by "any other person." 42 U.S.C. § 9607(a)(4)(B). Those provisions carry with them different standards and burdens of proof. Compare § 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A) (response costs incurred by the federal or state government must not be inconsistent with the national contingency plan) with § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B) (response costs incurred by "any other person" must be necessary and consistent with the national contingency plan).

Two cases support the Town's position that it should be considered a "state" for purposes of § 107(a)(4)(A).[22] See *Town of Wallkill*, 891 F.Supp. 955; *City of New York v. Exxon Corporation*, 697 F.Supp. 677 (S.D.N.Y.1988). *Town of Wallkill* held, without analysis, that the town was a "governmental plaintiff," i.e., "a state," for purposes of § 107(a)(4)(A). See *Town of Wallkill*, 891 F.Supp. at 959 (citing *Exxon*, 697 F.Supp. at 685).

In *Exxon*, the court held that the city was a "state" for purposes of § 107(a)(4)(A) and § 113(f)(2), particularly where the state had approved the city's role in the litigation and the settlement agreement was worked out between the State, the city, and the settlers. *Exxon*, 697 F.Supp. at 686. The court reasoned that although the statutory definition of the terms "United States" and "State" did not include municipalities,[23] Congress' use of the term "includes" conveys that there are other items includable, though not specifically enumerated. The court reasoned that Congress would have used the term "means," as it did in the statutory definition of "person,"[24] if it intended to limit the definition to those items specifically enumerated. It explained that a broad reading of sections §§ 107(a)(4)(A) and 113(f)(2) was consistent with the overall purpose of CERCLA. Allowing the City to proceed under § 107(a)(4)(A) and settle under § 113(f)(2) would advance CERCLA's remedial purposes by encouraging early and complete settlements.[25]

In contrast, a plethora holds that a municipality is not a "state" for purposes of § 107(a)(4)(A). See, e.g., *City of New York v. Chemical Waste Disposal Corp.*, 836 F.Supp. 968, 978 (E.D.N.Y.1993); *City of Heath, Ohio v. Ashland Oil, Inc.*, 834 F.Supp. 971, 977 (S.D.Ohio 1993); *City of Philadelphia v. Stepan Chemical Co. ("City*

22. Two other cases hold that a municipality, or a private party, is a "state" for purposes of contribution protection under § 113(f)(2), but do not hold that a municipality is a "state" for purposes of proceeding under § 107(a)(4)(A). See *City and County of Denver v. Adolph Coors Company*, 829 F.Supp. 340, 344 (D.Colo.1993) *Allied Corp. v. Acme Solvent Reclaiming, Inc.*, 771 F.Supp. 219, 222 (N.D.Ill.1990). Although these cases support the Town's position to the extent that a "state" under § 113(f)(2) should be the same thing as a "state" under § 107(a)(4)(A), policy considerations, such as facilitating settlement, may justify treating a municipality, or even a private party, as a "state" for purposes of § 113(f)(2), but not § 107(a)(4)(A).

23. Section 101(27) defines "United States" and "State" to "include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction." 42 U.S.C. § 101(27).

24. Section 101(21) provides that "'person' means an individual, firm, corporation, associa- tion, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdi- vision of a State, or any interstate body." 42 U.S.C. § 101(21).

25. *Exxon* relied upon Judge Ackerman's analysis in *Mayor and Board of Aldermen of the Town of Boonton v. Drew Chemical Corporation*, 621 F.Supp. 663, 666 (D.N.J.1985). See *Exxon*, 697 F.Supp. at 684. *Boonton* held that a town was a "state" for purposes of recovery under § 107(a)(4)(A) and (C). Judge Ackerman, howev- er, revisited this issue in *Borough of Rockaway v. Klockner & Klockner*, 811 F.Supp. 1039 (D.N.J. 1993), and held that he was "constrained to retreat from [his] earlier decision in *Boonton*." Reexamining his holding in light of subsequent decisions in *Town of Bedford v. Raytheon Co.*, 755 F.Supp. 469, 472 (D.Mass.1991) and *City of Phil- adelphia I*, 713 F.Supp. at 1488–1490, and in light of SARA, he concluded that a municipality was not a "state" for purposes of § 107(a)(4)(C). See *Borough of Rockaway*, 811 F.Supp. at 1047– 50. Judge Ackerman's reversal in connection with § 107(a)(4)(C) at the very least calls into question his holding that a municipality is a "state" for purposes of § 107(a)(4)(A).

*of Philadelphia I")*, 713 F.Supp. 1484, 1487–1490 (E.D.Pa.1989).

These decisions rely upon the text and structure of CERCLA. The courts explain that CERCLA's definition of "state" does not include political subdivisions such as municipalities and the entities included under the definition differ substantially from political subdivisions in terms of their authority and power. All are sovereigns and, unlike municipalities, do not depend on states for their authority to govern. The courts further note that "municipalit[ies]" and other "political subdivision[s]" are included within the statutory definition of "person." *See Chemical Waste,* 836 F.Supp. at 977; *City of Heath,* 834 F.Supp. at 977; *City of Philadelphia I,* 713 F.Supp. at 1487–88.

These courts reason that the fact that Congress explicitly decided to mandate similar authority to states and municipalities explicitly in some sections of CERCLA but not in others buttresses the argument that, given the differences in language between § 107(a)(4)(A) and § 107(a)(4)(B), Congress intended to treat states differently. *See Chemical Waste,* 836 F.Supp. at 977; *City of Heath,* 834 F.Supp. at 977; *City of Philadelphia I,* 713 F.Supp. at 1489.

The Town argues that the reasoning in *Chemical Waste* and *City of Philadelphia I* is inapplicable here because the issue there was which burden of proof applied to a municipality[26] while the issue here is liability, i.e., whether the Town can seek to impose joint and several liability or is limited to contribution. The Town correctly observes that *Chemical Waste* limits its reading of § 107(a)(4)(A) to situations in which the burden of proof is at issue: "the language of section 107(a)(4) requires that the City bear the same burdens of proof and persuasion as any other person seeking response costs, as provided by section 107(a)(4)(B) of CERCLA." *Chemical Waste,* 836 F.Supp. at 978. In fact, *Chemical Waste* cited *Exxon* approvingly:

Clearly [*Exxon's* broad] reading of [§§ 107(a) and 113(f)(2) ] for the purposes of settlement is consistent with the objectives of CERCLA, but to interpret section 107(a)(4) in such a way as to relieve local government of the burden of proving that their costs of response are consistent with the NCP is an interpretation not only unsupported by the language of the statute but also not necessarily consistent with the objectives and policies underlying CERCLA.

*Chemical Waste,* 836 F.Supp. at 978.

Although the text and structure of CERCLA support a restrictive reading of the term "state" to exclude municipalities, this Court is mindful that CERCLA "is far from being a model of statutory or syntactic clarity," *City of New York v. Exxon Corp,* 633 F.Supp. 609, 613–14 (S.D.N.Y.1986), and should be enforced " 'in such a manner that its overriding purpose will be achieved, even if the words used leave room for a contrary interpretation.' " *Capitano,* 732 F.2d at 1075. Thus, several courts and this Court itself have read the term "state" broadly when necessary to promote CERCLA's purposes. *See, e.g., Chemical Waste,* 836 F.Supp. at 978; *Exxon,* 697 F.Supp. at 686; *City and County of Denver,* 829 F.Supp. at 344; *Allied Corp.,* 771 F.Supp. at 222–23; Consent Decree with Coke–NY, dated August 4, 1995. These courts have held that CERCLA's overriding interest in the promotion of settlement requires a broad reading of "state" in § 113(f)(2), despite the plain meaning of the statutory language: "[i]t is hard to imagine that any defendant in a CERCLA action would be willing to settle if, after settlement, it would remain open to contribution claims from other defendants." *Allied Corp.,* 771 F.Supp. at 222.

Here, however, there is no express purpose of CERCLA that would be served only by broadly reading the term "state" in § 107(a)(4)(A) to include municipalities. First, in contrast to § 113(f) where courts

---

**26.** Treating a municipality as a "state" in *Chemical Waste* and *City of Philadelphia I* would have entitled it to a lower burden of proof, i.e., to have its response costs presumed to be consistent with the national consistency plan. *See* § 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A). Treating a municipality as "any other person," however, would require it to bear the burden of proving that its response costs are "necessary and consistent with the national contingency plan." Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B).

have found it necessary to imply a contribution bar for parties settling with municipalities because § 113(f) provides contribution protection only to parties settling with "the United States or a State," section 107(a)(4) provides that responsible parties shall be liable both to "the United States Government or a State," § 107(a)(4)(A), and to "any other person," § 107(a)(4)(B). Thus, Congress has already explicitly provided for other persons, including municipalities, in § 107(a)(4)(B).

Second, the Town offers no explanation as to how a municipality differs from other entities included in the definition of "any other person," or why that difference would warrant treating it as a "state." The Town's argument that its ability to seek to impose joint and several liability is necessary to encourage voluntary commencement of cleanups would apply equally to private parties. Although *City and County of Denver*, 829 F.Supp. at 344, held that reading the term "state" in § 113(f) to include private parties was in keeping with CERCLA's spirit of facilitating settlement, broadly reading § 107(a)(4)(A)'s "state," in the manner suggested by the Town, would subsume the entities already covered by § 107(a)(4)(B), rendering it redundant. For these reasons, this Court declines to consider the Town a "state" for purposes of § 107(a)(4)(A).

c. *Whether liability under § 113 is joint and several*

 Finally, the Town argues that joint and several liability can be imposed in a contribution action. The Town relies primar-

ily upon language in *United Technologies*, 33 F.3d at 99, defining "contribution" as "a claim by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make," and in *Amoco Oil*, 889 F.2d at 672, stating that a court has considerable latitude under § 113 to determine each liable party's equitable share.

 In a CERCLA action for contribution, federal common law principles apply. See 42 U.S.C. § 9613(f)(1). Accordingly, courts determining liability in such actions have applied the Restatement (Second) of Torts ("Restatement"), the Uniform Contribution Among Tortfeasors Act ("UCATA"), and the Uniform Comparative Fault Act ("UCFA"). See *Alcan Aluminum*, 990 F.2d at 722 (applying the Restatement and UCFA). Under federal common law, a contribution action imposes liability for a tortfeasor's proportionate, allocable share.[27] That is the very definition of contribution. See *Alcan Aluminum*, 990 F.2d at 722 (contribution action is one in which each is liable for damages only for its own portion of the harm); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 229 (D.Mo.1985) (under the Restatement, UCFA, and UCATA, contribution liability is several); see also *In re Agent Orange Product Liability Litigation*, 818 F.2d 204, 207 (2d Cir.1987) ("Contribution is the proportionate sharing of liability among tortfeasors").

Neither case cited by the Town imposed joint and several liability under § 113. Nei-

27. The Restatement (Second) of Torts provides:
The right of contribution exists only in favor of a tortfeasor who has discharged the entire claim for the harm by paying more than his equitable share of the common liability, and is limited to the amount paid by him in excess of his share. No tortfeasor can be required to make contribution beyond his own equitable share of the liability.
Restatement (Second) of Torts § 886A(2) (1982).
The Uniform Contribution Among Tortfeasors Act provides:
The right of contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share. No tortfeasor is compelled to make contribution beyond his own pro rata share of the entire liability.

Revised Uniform Contribution Among Tortfeasors Act (Revised Act 1955) § 1(b), 12 U.L.A. 63 (1995).
The Uniform Comparative Fault Act provides:
A right of contribution exists between or among two or more persons who are jointly and severally liable upon the same indivisible claim for the same injury, death, or harm, whether or not judgment has been recovered against them. It may be enforced either in the original action or by a separate action brought for that purpose. The basis for contribution is each person's equitable share of the obligation, including the equitable share of a claimant at fault. ...
Uniform Comparative Fault Act § 4(a), 12 U.L.A. 55, 58 (Supp.1995).

ther case held that liability under § 113 could be joint and several. The cases merely discuss apportioning liability by and between parties that were jointly and severally liable, without stating that a claim for contribution may result in joint and several liability.

Accordingly, the State's motion to dismiss the Town's § 107 claim is granted.

In conclusion, (1) the motion of defendants Tesa Tuck, GAF, Frye, and Lightron and third-party defendants Kollmorgen and Coke–NY for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing the complaint in its entirety is denied, except that portion seeking the dismissal of the Town's state law nuisance claim is granted; (2) the motion of the Town to amend the First Amended Complaint to add as defendants Kollmorgen, Mearl and Coke–NY, pursuant to Rule 15 of the Federal Rules of Civil Procedure, is granted; (3) the motion of the State to amend its pleading to realign as a party plaintiff, pursuant to Rule 15 of the Federal Rules of Civil Procedure, is granted; and (4) the motion of the United States to dismiss the Town's § 107 claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure, is granted.

SO ORDERED.