**FIREMAN'S FUND INSURANCE COMPANY, a California corporation, Plaintiff,**

v.

**CITY OF LODI, CALIFORNIA, et al., Defendants.**

**No. CIV. S 98–1489 FCD JFM.**

United States District Court, E.D. California.

Feb. 25, 1999.

Terry J. Houlihan and Edward Strohbehn, Jr., McCutchen, Doyle, Brown & Enerson, LLP, San Francisco, CA; Judith H. Volkart, Fireman's Fund Ins, Co., for Plaintiff.

Randall A. Hays, City Attorney, City of Lodi, CA, Michael C. Donovan and Adam Babich, Asstant City Attorneys, Zevnik Horton Guibord McGovern Palmer & Fognani, LLP, Palo Alto, CA, Stephen C. Neal, Benjamin K. Riley and Eugene M. Pak, Cooley Godward LLP, San Francisco, CA, for Defendants.

Elliot L. Bien, Bien and Summers LLP, Novato, CA, for Amicus Curiae: Insurance Environmental Litigation Association.

Gary l. Fontana and Karl D. Belgum, Thelen Reid & Priest LLP, San Francisco, CA, Craig A. Berrington and Laura L. Kersey, American Insurance Association, Washington, DC, for Amicus Curiae: American Insurance Association.

## MEMORANDUM AND ORDER

DAMRELL, District Judge.

In response to an ordinance adopted by the City of Lodi, California (the "City"), plaintiff Fireman's Fund Insurance Company ("Fireman's Fund") brings suit against the City; Mayor Jack Sieglock in his official capacity; Enforcement Officers Richard C. Prima, Jr., and Fran E. Forkas in their official capacities; City Attorney Randall A. Hays in his official and individual capacities; and Michael C. Donovan and Zevnik Horton Guibord & McGovern, LLP (collectively, the "Firm"), private attorneys acting as assistant city attorneys for Lodi, in their official and individual capacities.[1] Fireman's Fund alleges that

---

1. Defendants Adam L. Babich, Bret A. Stone, Steven H. Doto, and John R. Till were dismissed without prejudice by stipulation of the parties. *See* Stip. & Order filed 9/28/98.

the City's Comprehensive Municipal Environmental Response and Liability Ordinance (the "Ordinance") is preempted by federal and state law and violates the United States Constitution and the California State Constitution. Specifically, Fireman's Fund alleges that the Ordinance is preempted by the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, and the California Hazardous Substance Account Act (HSAA), Cal. Health & Safety Code § 25300 *et seq.*, and that the Ordinance violates Fireman's Fund's rights secured by the Due Process Clause of the United States Constitution, and the Equal Protection and Contract Clauses of the United States and California State Constitutions.

This matter comes before the court on Fireman's Funds' motion for partial summary judgment and permanent injunction and defendants' motions to dismiss.[2] The parties were heard at extended oral argument on December 4, 1998. Having reviewed the numerous filings and exhaustive arguments, the court finds that the individual defendants and the Firm are immune from suit, that CERCLA does not preempt the Ordinance, and that the court should abstain from consideration of whether the ordinance is preempted by the HSAA. Accordingly, Fireman's Fund's motion for partial summary judgment and permanent injunction is denied, the individual defendants', the Firm, and the first cause of action are dismissed, and the second through sixth causes of action are dismissed without prejudice.

### PRELIMINARY RULINGS

At the December 4 hearing, the court took judicial notice of the remedial provisions of the municipal codes of San Francisco, Los Angeles, Chicago, and New York City; California Health and Safety Code sections; the imminent expiration of HSAA provisions; and the Order of the San Joaquin Superior Court. Fireman's

Fund's response to the requests was noted.

The court also accepted the amici briefs filed by the American Insurance Association and Insurance Environmental Litigation Association. Responses to the briefs were noted.

Despite the parties' excessive use of proffers and corrections, the court accepted them. Fireman's Fund's protest was noted.

### STANDARD

**1. Summary Judgment**

Summary judgment is appropriate if the record, read in the light most favorable to the non-moving party, demonstrates no genuine issue of material fact. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those necessary to the proof or defense of a claim, and are determined by reference to the substantive law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. Moreover, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).

**2. Dismissal**

A complaint will not be dismissed under Federal Rule of Civil Procedure 12(b)(6),

---

**2.** Plaintiff filed a motion for preliminary injunction on August 24, 1998. Plaintiff's motion for partial summary judgment and per-

manent injunction supercedes the motion for preliminary injunction.

"unless it appears beyond doubt that [a] plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Yamaguchi v. Department of Air Force,* 109 F.3d 1475, 1480 (9th Cir.1997) (quoting *Lewis v. Telephone Employees Credit Union,* 87 F.3d 1537, 1545 (9th Cir. 1996)). "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996).

### BACKGROUND

#### 1. Factual Background[3]

In April 1989 the City detected tetrachloroethene (PCE) in a water sample from a new water tank. Subsequent testing found PCE contamination in the groundwater and several City water wells. In March 1992 the Central Valley Regional Water Quality Control Board (RWQCB) issued a report identifying a cleaning business insured by Fireman's Fund as one potential source of PCEcontaminated wastewater discharged into the City's sewer lines and suspected as the source of the soil and groundwater contamination.

In 1993 the California State Department of Toxic Substance Control (DTSC) began its investigation of the contamination. In 1994 DTSC began an administrative action against selected potentially responsible parties, including the City, to address the soil and groundwater contamination.

The City retained Zevnik Horton Guibord & McGovern, LLP, a private law firm, in or about January 1997. At that time, the City also began a series of requests to the regional and headquarter levels of the Environmental Protection Agency (EPA) seeking a delegation of information gathering authority under CERCLA. The EPA twice denied the request.

On April 16, 1997, the City adopted Ordinance No. 1647 declaring any unpermitted or unregulated presence of a hazardous substance in the environment a

nuisance. At a meeting on May 6, 1997, Lodi's City Council authorized the City Manager to execute a "Comprehensive Joint Cooperative Agreement" ("Agreement") with the DTSC concerning the investigation and abatement of hazardous substance contamination in and affecting the City. On August 6, 1997, the City Council adopted the Ordinance that gives rise to this action. The Ordinance, modeled on CERCLA and the HSAA, declares certain conditions, releases, and processes to be "public nuisances."

The City issued Notices of Endangerment, in accordance with the Federal Resource Conservation and Recovery Act, 42 U.S.C. § 6972(b)(2)(A), to potentially responsible parties in June 1997. The notices stated that these potentially responsible parties (PRP) were jointly and severally liable for investigation and remediation costs and that the City intended to commence a civil or administrative action against them unless they settled the claim. Enclosed with the notice was a settlement form releasing the PRP from further liability if he or she would pay an amount equal to its insurance policy limits. If an insurer was unwilling to authorize a policy limits settlement, the PRP could enter into a stipulated settlement in which the City agreed not to execute any judgment that might be obtained on any asset "except the remaining insurance policies issued by the non-settling insurer."

The City entered a proposed settlement agreement with a party to whom it sent an Abatement Action Order. Following the settlement, the City filed a civil complaint and "Proposed Final Consent Decree, Final Order and Final Judgment" in the Eastern District of California seeking judgment in the amount of one-million dollars. The matter is pending.

The City has issued two "Information Gathering Demands" to insurers pursuant to the Ordinance. When their demands were refused, the City filed criminal mis-

demeanor complaints against the insurers seeking sanctions for their failure to respond. The insurers filed demurrers which were granted, and the cases were dismissed. The City then filed civil complaints against the insurers seeking mandatory and permanent injunctive relief and ordering the insurers to comply with the demands. These actions are pending.

## 2. Procedural Background

On August 6, 1998, Fireman's Fund filed its complaint alleging that the City's adoption of the Ordinance (1) violated the Supremacy Clause of the United States Constitution; (2) violated Article 11, Section 7 of the California State Constitution; (3) violated Fireman's Fund's procedural due process rights secured by the Fourteenth Amendment; (4) violated Fireman's Fund's substantive due process rights secured by the Fourteenth Amendment and Article 1, Section 7 of the California State Constitution; (5) impaired Fireman's Fund's right to contract secured by Article 1, Section 10, Clause 1 of the United States Constitution and Article 1, Section 9 of the State Constitution; and (6) denied Fireman's Fund equal protection under the Fourteenth Amendment and Article 1, Section 7 of the California State Constitution.

On August 24, 1998, Fireman's Fund moved for a preliminary injunction. On September 21, 1998, while the preliminary injunction motion was pending, defendants Doto, Stone, Till, Donovan, Babich, and the Firm moved to dismiss and to strike.[4] Also on September 21, 1998, the City and its officers moved to dismiss the complaint.

On October 16, 1998, Fireman's Fund filed a motion for partial summary judgment and permanent injunction.

**4.** Defendants Doto, Till, Stone, and Babich were dismissed by stipulation of the parties. *See* Order dated 9/21/98.

**5.** In the instant action, defendant Hays is the City Attorney; defendants Donovan and the Firm were retained by the City and made assistant city attorneys. As retained counsel, Donovan and the Firm may assert qualified

After extensive briefing by the parties in support of and opposition to the motions, the court held a hearing on December 4, 1998.

## ANALYSIS

### 1. Individual Defendants and the Firm

Fireman's Fund brings suit against defendants Sieglock, Prima, and Forkas in their official capacities and defendants Hays, Donovan, and the Firm in their official and individual capacities. Defendants argue that the official capacity suits are duplicative of the claims against the City and that they are immune from suit in their individual capacities.

### A. Official Capacity Suits

■ A claim against a municipal officer in an official capacity is tantamount to a claim against the entity; it has the same effect as a suit directly against the city. *See Hafer v. Melo,* 502 U.S. 21, 24, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir.1991). Thus, the claims against Sieglock, Prima, Forcas, Hays, Donovan, and the Firm in their official capacities are redundant.

### B. Qualified Immunity

■ The remaining individual capacity claims against defendants Hays, Donovan, and the Firm must be dismissed because the defendants are entitled to qualified immunity. Government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory rights of which a reasonable person would have known."[5] *Harlow v. Fitzgerald,* 457

immunity to the same extent as any city official. *See Cullinan v. Abramson,* 128 F.3d 301, 310 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998) ("[T]he rationales for qualified immunity apply to [private] lawyers and their firm in about the same way they apply to [the government attorney]").

U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is not merely an immunity to liability, but immunity from suit itself. *See Babb v. Dorman,* 33 F.3d 472, 477 (5th Cir.1994).

■ In the Ninth Circuit, a two-part test determines the scope of qualified immunity for governmental officials. First, the court must determine whether the law governing the officials' conduct was clearly established at the time the officials acted. If the law was not clearly established, qualified immunity applies. If the law was clearly established, the court must determine whether reasonable officials would have believed that their actions were lawful. If the court so finds, the officials are entitled to qualified immunity. *See Somers v. Thurman,* 109 F.3d 614, 616–17 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 143, 139 L.Ed.2d 90 (1997); *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871 (9th Cir.1993).

■ For a federal right to be clearly established at the time of the defendant's alleged conduct:

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he's doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law that unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations omitted). The threshold determination of whether the law governing the conduct at issue is clearly established is a question of law for the court. *See Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. Fireman's Fund bears the burden of showing that the constitutional right at issue was clearly established at the time of defendants' conduct. *See Baker v. Racansky,* 887 F.2d 183, 186 (9th Cir.1989). A determination of reasonableness, although it may require consideration of factual issues, is appropriate for summary judgment if the facts are undisputed. *See Act Up!/ Portland v. Bagley,* 988 F.2d at 872.

It is clearly established that defendants are not entitled to enforce unconstitutional statutes so as to deprive plaintiffs of their rights. It is not at all clear, however, that a reasonable attorney would have known that the Ordinance was unconstitutional. The complexity of the issues presented to this court and the amount of briefing submitted in support of and opposition to the motions belies the argument that a reasonable attorney would have recognized the unconstitutionality of the Ordinance. Defendants Hays, Donovan, and the Firm are entitled to qualified immunity.

Accordingly, defendants Sieglock, Prima, Forkas, Hays, Donovan, and the Firm are dismissed.

## 2. Ripeness

■ Defendants argue that Fireman's Fund's claims are not yet ripe for adjudication and are properly dismissed. In determining whether plaintiff's claims are ripe, the court considers (1) whether the issues are fit for judicial decision, and (2) whether the parties will suffer hardship if the court declines to consider the issues. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

■ In the instant case, the court finds the issues fit for judicial decision. The issues do not require further factual development: the content of the Ordinance is clear as are the City's intentions to enforce the Ordinance so as to maximize its recovery of the insurance assets of potentially responsible parties. As the Supreme Court has explained, a constitutional challenge to an economic loss attributable to legislation can be ripe even where significant steps remain before the transaction at issue actually takes place. *See Blanchette v. Connecticut Gen. Ins. Corp.,* 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

### 3. Standing

Fireman's Fund bears the burden of establishing its standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Defendants argue that Fireman's Fund cannot meet that burden because there has been no "injury-in-fact" to plaintiff's legally protected interest. *See Sierra Club v. Morton*, 405 U.S. 727, 740, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (emphasizing that complaint must establish that plaintiff has "direct stake in the outcome" of lawsuit such that decision will resolve concrete dispute to show injury-in-fact).

Fireman's Fund has alleged a direct threat sufficient to confer standing. The City's unconcealed plan to target insurers like Fireman's Fund demonstrates the imminence of the threat. "The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir.1996) (citation omitted). However, "[b]ecause it is clear to whom these provisions of the [Ordinance] would be applied were they to be applied at all, the imminent threat of such prosecutions can be deemed speculative only if it is likely that the government may simply decline to enforce these provisions at all." *Navegar, Inc. v. United States*, 103 F.3d 994, 1000 (D.C.Cir.1997). The City's intent to enforce the Ordinance against insurers is not speculative.

In this case four factors are indicative of an actual controversy despite the absence of a specific threat: (1) the highly specific provisions of the Ordinance and their applicability to Fireman's Fund; (2) the Ordinance's recent enactment (as opposed to a statute that "has lain moribund for years"); (3) the enforcement of the Ordinance against parties whose status under the law is identical to plaintiff's; and (4) indications that the Ordinance will be enforced in the future. *See Seattle Sch. Dist. No. 1 v. Washington*, 633 F.2d 1338, 1342 (9th Cir.1980). More than a general threat of enforcement faces plaintiff. Fireman's Fund has "suffered an 'injury-in-fact' to a legally protected interest that is both 'concrete and particularized' and 'actual and imminent' as opposed to 'conjectural' or 'hypothetical.'" *San Diego County*, 98 F.3d at 1126. "One does not have to await the consummation of threatened injury to obtain preventative relief. If the injury is certainly impending, that is enough." *Blanchette*, 419 U.S. at 143, 95 S.Ct. 335 (citation omitted).

### 4. Federal Preemption

The Supremacy Clause of the Constitution, Art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to the laws of [C]ongress, made in pursuance of the [C]onstitution." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 211, 6 L.Ed. 23 (1824)). Federal law preempts state law explicitly if the language of the federal statute reveals an express congressional intent to do so. *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). In the absence of such explicit statutory language, there are two ways of finding preemption by implication: "field preemption" and "conflict preemption." Field preemption occurs "where the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for the States to supplement it." *United States v. City and County of Denver*, 100 F.3d 1509, 1512 (1996) (citing *Barnett Bank*, 517 U.S. at 31, 116 S.Ct. 1103).

> Congress' intent to supersede state law in a given area may nonetheless be implicit if a scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," if "the Act of Congress ... touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on

the same subject," or if the goals "sought to be obtained" and the "obligations imposed" reveal a purpose to preclude state authority.

*Mortier*, 501 U.S. at 605, 111 S.Ct. 2476 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Conflict preemption occurs when Congress has not chosen to occupy a particular field, but federal and state law conflict. "Such a conflict arises when compliance with both federal and state regulations is a physical impossibility or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Mortier*, 501 U.S. at 605, 111 S.Ct. 2476 (citations and quotation marks omitted).

■ Federal preemption of state law is not favored, especially in areas of law traditionally dominated by the individual states. When considering the preemptive effect of a federal statute, the court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless it was the clear and manifest purpose of Congress." *Rice*, 331 U.S. at 230, 67 S.Ct. 1146; *see English v. General Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). For the purposes of this preemption analysis, the court analyzes the constitutionality of a local ordinance and a statewide law in the same way. *Mortier*, 501 U.S. at 605, 111 S.Ct. 2476.

### A. Explicit Preemption

In enacting CERCLA, Congress did not explicitly preempt all state environmental laws. *See, e.g., Bedford Affiliates v. Sills*, 156 F.3d 416, 426 (2d Cir.1998); *Witco Corp. v. Beekhuis*, 38 F.3d 682, 687 (3d Cir.1994); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1455 (6th Cir.1991); *see also City and County of Denver*, 100 F.3d at 1512 (implicitly finding that language of CERCLA reveals no express congressional intent to preempt state law). Fireman's Fund does not argue otherwise.

### B. Field Preemption

■ Fireman's Fund argues that the Ordinance illegitimately seeks to assert the City's authority in an area completely occupied by CERCLA and California's HSAA. Plaintiff contends that CERCLA authorizes only states to impose additional requirements and that California has used its authority to implement the HSAA. According to Fireman's Fund, CERCLA granted no such authority to subdivisions of states or municipalities. It is undisputed that neither the EPA nor the HSAA delegated any powers to the City, and that the only power delegated to the City through its settlement with the DTSC was a limited power to gather information, not exercise the powers granted by the HSAA. According to Fireman's Fund, the court should draw the conclusion that the federal-state scheme created by CERCLA and HSAA occupies the field. The court disagrees.

■ CERCLA is not so comprehensive a scheme of regulation that it provides no room for supplementation by the states. *See, e.g., Bedford Affiliates*, 156 F.3d at 426–27; *Witco Corp.*, 38 F.3d at 687; *Akzo Coatings*, 949 F.2d at 1455; *see also City and County of Denver*, 100 F.3d at 1512 (implicitly finding that CERCLA does not preempt the field). CERCLA states: "Nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to release of hazardous substances within the State." 42 U.S.C. § 9614(a). Congress clearly intended that CERCLA would not occupy the field and anticipated state statutes and regulations imposing additional liability and requirements tailored to the needs of smaller jurisdictions. Fireman's Fund does not dispute that CERCLA alone does not occupy the field; Fireman's Fund argues that CERCLA plus California's HSAA equals occupation of the field, leaving the City no room in which to legislate.

**1110**

The crucial question in this field preemption analysis is whether the term "States" can be read broadly enough to encompass municipalities. Based on this court's reading of *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991), CERCLA's failure to specifically identify municipalities in § 9614(a) is not significant. As the Supreme Court stated in *Mortier* in construing the regulatory authority granted to "States" by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), "[t]he exclusion of political subdivisions cannot be inferred from the express authorization to the 'State[s]' because political subdivisions are components of the very entity the statute empowers." *Mortier*, 501 U.S. at 608, 111 S.Ct. 2476. "Mere silence, in this context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority." *Id.* at 607, 111 S.Ct. 2476. Because "[t]he term 'state' is not self-limiting since political subdivisions are merely subordinate components of the whole," in order to find field preemption, the court would have to find that states could not redelegate the authority granted to them under CERCLA to their political subdivisions "either specifically or by leaving undisturbed their existing statutes that would otherwise provide local government with ample authority to regulate." *Id.* at 612, 111 S.Ct. 2476. Moreover, the Supreme Court found:

> Even if FIFRA's express grant of regulatory authority to the States could not be read as applying to municipalities, it would not follow that municipalities were left with no regulatory authority. Rather, it would mean that localities could not claim the regulatory authority explicitly conferred upon the States that might otherwise have been pre-empted through actual conflicts with federal law.

*Id.* Having found that the word "states" does not exclude municipalities, the court

does not find that CERCLA precludes states from explicitly or implicitly redelegating their authority to their political subdivisions. Moreover, field preemption cannot be inferred from CERCLA. Section 9614(a) quoted above clearly anticipates that states (and municipalities) will adopt environmental regulations. This language allowing states (and municipalities) to adopt more stringent environmental regulations would be surplusage if Congress had intended to occupy the entire field of hazardous waste cleanup. The court finds the Supreme Court's reasoning in *Mortier* equally applicable to CERCLA.[6]

Arguing in favor of field preemption, Fireman's Fund cites three cases: *Town of New Windsor v. Tesa Tuck, Inc.*, 919 F.Supp. 662 (S.D.N.Y.1996); *Borough of Sayreville v. Union Carbide Corp.*, 923 F.Supp. 671 (D.N.J.1996); and *Washington State Dep't of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793 (9th Cir. 1995). These cases are not persuasive. *Town of New Windsor* holds that a municipality is not a "government plaintiff" for purposes of cost recovery actions brought pursuant to CERCLA. *See* 919 F.Supp. at 681–82 (holding that municipality is not "state" for purposes of § 107(a)(4)(A) of CERCLA, 42 U.S.C. § 9607(a)(4)(A)). However, that limited definition of "state" is not applicable in all instances. In *Town of New Windsor*, the district court acknowledged that "policy considerations, such as facilitating settlement," might justify treating a municipality as a "state" under CERCLA. *Id.* at 682 & n. 22. In the instant case, prompt and efficient remediation of a hazardous waste site is the policy consideration justifying the expansive definition of "state."

In *Borough of Sayreville*, the district court held that a municipality is not an authorized representative of a state for purposes of bringing an action for natural

**6.** In *City and County of Denver*, 100 F.3d at 1513, the Tenth Circuit declined to apply *Mortier* when to do so would impede CERCLA's objective of promoting prompt and efficient remediation of hazardous waste sites. As discussed below, application of *Mortier* in the instant case would not impede CERCLA's overall objective. The Tenth Circuit's reasoning for refusing to apply *Mortier* to CERCLA does not hold in this case.

resource damages recovery under CERCLA unless the municipality has been specifically appointed by the governor of the state. 923 F.Supp. at 680–81. Section 104(a)(4)(C) permits only "[t]he President, or the authorized representative of any State" to bring suit on behalf of the public for damages to natural resources. 42 U.S.C. § 9607(f)(1). It is axiomatic that the "authorized representative of any State" must be appointed by the governor of that state, and that a municipality, by its own initiative, cannot become the authorized representative of its state. *Borough of Sayreville* does not support the notion that a municipality cannot be treated as a state for purposes of CERCLA's other provisions.

Finally, Fireman's Fund relies on the Ninth Circuit's decision in *Washington State* to support its contention that a municipality cannot be a state under CERCLA. In fact, *Washington State* holds only that state administrative departments and agencies are within CERCLA's definition of state. 59 F.3d at 800. The Ninth Circuit did not hold that municipalities fall outside the definition of a state. On the question of whether a municipality is a state for purposes of CERCLA, the court stated:

> Some courts have concluded that the definition of "State" does not include political subdivisions such as municipalities. These cases are not relevant to the issue before us today. A municipality, a local government with authority over a limited area, is a different type of government unit than a state-wide agency that is part of the organized government of the state itself. Our discussion is limited to whether the definition of "State" encompasses the latter.

*Id.* at 800 n. 5 (citation omitted).

CERCLA does not preempt the field. Congress clearly intended states to enact hazardous waste regulations, and that grant of authority to states encompasses municipalities.

## C. Conflict Preemption

Fireman's Fund asserts that the Ordinance conflicts with CERCLA in six respects: (1) the apportionment of liability and allocation of costs; (2) the allowance of direct actions against insurers; (3) the presumption of consistency with federal clean-up procedures; (4) the recovery of natural resource damages; (5) the power to gather information and documents; and (6) the standard of proof for liability. As described above, conflict preemption occurs when "it is impossible to comply with both federal and state laws, or the state law stands as an obstacle to the accomplishment of Congress's objectives." *City and County of Denver*, 100 F.3d at 1512. Neither circumstance is present in this case.

A quintessential example of conflict preemption due to physical impossibility is found in *United States v. City and County of Denver*. Denver had a local zoning ordinance that directly conflicted with a remedial order issued by the Environmental Protection Agency; the remedial order required on-site solidification of contaminated soils, but Denver's zoning ordinances prohibited the owner from maintaining hazardous waste in areas zoned for industrial use. The owner could not obey both the EPA's remedial order and the cease and desist order issued by Denver. This is conflict preemption, and the district court and Tenth Circuit Court of Appeal so found. *Id.* at 1512–13.

The circumstances in this case are not analogous. The Ordinance is not in actual conflict with CERCLA as to any of the six areas identified by Fireman's Fund. Placed side by side, the Ordinance and CERCLA differ but it is not physically impossible for Fireman's Fund to comply with the provisions of CERCLA and the provisions of the Ordinance. Moreover, no agency, federal or state, is enforcing CERCLA's provisions in this hazardous waste cleanup effort, nor has Fireman's Fund identified any provision of CERCLA with which it must comply pursuant to any order or

request of any federal or state agency. Therefore, Fireman's Fund need not choose between compliance with CERCLA and compliance with the Ordinance.

Nor does the Ordinance stand as an obstacle to the prompt and efficient remediation of hazardous waste sites. To the contrary, the Ordinance seeks to efficiently collect funds with which the City can institute hazardous waste cleanup. The Ordinance differs from CERCLA in several respects but it is consistent with the overall objectives of CERCLA. Moreover, CERCLA anticipates the promulgation of non-federal hazardous waste statutes and regulations. Municipal regulations cannot be said to thwart Congress's intent to create uniform national hazardous waste legislation where no such congressional intent is apparent. The court does not find that the Ordinance is an obstacle to accomplishment of Congress's goal in enacting CERCLA.

**5. State Preemption**

■■■ Plaintiff asks this court to determine whether "the city ordinance is preempted by state law[,] ... a sensitive and complex issue involving the distribution of power between the state and local governments." *Cedar Shake and Shingle Bureau v. City of L.A.*, 997 F.2d 620, 622 (9th Cir.1993). Preliminary to any decision on the merits, this court must consider the wisdom of exercising jurisdiction over the state preemption issue. Three factors must be present before abstention is allowed under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941):

(1) the complaint must involve a "sensitive area of social policy" that is best left to the states to address; (2) "a definitive ruling on the state issues by a state court could obviate the need for constitutional adjudication by the state court"; and (3) "the proper resolution of the potentially determinative state law issue is uncertain."

*Cedar Shake and Shingle*, 997 F.2d at 622 (citing *Kollsman v. City of L.A.*, 737 F.2d 830, 833 (9th Cir.1984)). All three factors are present in the instant case.

First, the preemption question requires the interpretation of a local ordinance which enables the City to pay for hazardous waste remediation it otherwise could not afford. This is an area of serious local concern about which the DTSC has expressed no opinion and into which federal intrusion is undesirable.

Second, the resolution of the preemption question would avert the need for this court to make a constitutional ruling. If a state court determines that the local ordinance is preempted by the HSAA, the ordinance would be void, and a federal court would not have to decide Fireman's Fund's Due Process, Equal Protection, and Contract Clause claims.

Third, the resolution of the preemption question is unclear. Article XI, section 7 of the California State Constitution provides that municipalities may make and enforce ordinances "not in conflict with general laws." An ordinance in conflict with general laws is void.

Conflicts exist if the ordinance duplicates, contracts, or enters an area fully occupied by general law, either expressly or by legislative implication. If the subject matter or field of the legislation has been fully occupied by the state, there is no room for supplementary or complementary local legislation, even if the subject [was] otherwise one properly characterized as "a municipal affair."

*Cedar Shake and Shingle*, 997 F.2d at 623 (quoting *Cohen v. Board of Supervisors*, 40 Cal.3d 277, 219 Cal.Rptr. 467, 474, 707 P.2d 840 (1985) (citations omitted)). The California Supreme Court has determined that the HSAA does not preempt local zoning ordinances forcing hazardous waste disposal facilities to remove waste from areas designated by land use permits. *IT Corp. v. Solano County Bd. of Supervisors*, 1 Cal.4th 81, 2 Cal.Rptr.2d 513, 820 P.2d 1023 (1991) *rev'g* 272 Cal.Rptr. 574 (Cal.Ct. App.1990). However, California courts have not decided whether local ordinances

governing the remediation of hazardous waste sites duplicate and/or contradict the HSAA. Such a definitive ruling on this sensitive issue by a state court could obviate the need for this court to rule on the constitutional claims. However, the California courts have not spoken definitely in this matter.

Accordingly, this court abstains from ruling on whether the Ordinance is preempted by the HSAA.

### 9. The City's December 23, 1998 Letter

At the December 4 hearing, the court asked plaintiff's counsel if the City could be a potentially responsible party (PRP) under CERCLA. Plaintiff's counsel answered affirmatively, but unable to cite a case in support of his answer, he agreed to promptly file a letter containing the appropriate citations. The court received counsel's two-page letter on December 14, 1998. The letter lists citations for five cases followed by brief descriptions of the propositions for which they are cited.

On December 23, 1998, the City filed a four-page response and attached a copy of a note from the Stanford Environmental Law Journal. The court neither solicited nor approved the filing of the City's response. Local Rule 78–230 makes no provision for the filing of such documents. It is improper. Fireman's Fund moves the court to strike the City's letter filed December 23, 1998. The motion to strike is granted.[7]

### CONCLUSION

1. Plaintiff's motion for partial summary judgment and for permanent injunction is DENIED.

2. The individual defendants and the Firm are DISMISSED.

3. The first cause of action is DISMISSED as to Defendant City of Lodi.

4. The court abstains from consideration of plaintiff's second through sixth causes of action, and they are DISMISSED WITHOUT PREJUDICE.

5. Defendant City of Lodi's letter filed December 23, 1998, is STRICKEN.

The Clerk of the Court is directed to close this file.

IT IS SO ORDERED.

**UNITED STATES SATELLITE BROADCASTING COMPANY, INC., Plaintiff,**

v.

**Robert LYNCH, et al., Defendants.**

**No. Civ. S–98–1838 WBS/DAD.**

United States District Court,
E.D. California.

March 12, 1999.

---

7. Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. L.R. 78–230(h).

1114

**1116**

Stephen Woods White, Kronick Moskovitz Tiedemann and Girard, Sacramento, CA, Maria Colsey Heard, Pro Hac Vice, Leslie R Cohen, Pro Hac Vice, Bernard Nash, Pro Hac Vice, Dickstein Shapiro Morin and Oshinsky, Washington, DC, for plaintiff.

Marcia A. Fay, Attorney General's Office of the State of California, Sacramento, CA, for defendants.

## MEMORANDUM AND ORDER

SHUBB, Chief Judge.

This 42 U.S.C. § 1983 action for declaratory and injunctive relief challenges "the Boxing Act," a California law that imposes a five percent gross receipts tax on all pay-per-view telecasts of boxing, wrestling, kickboxing, and similar contests. *See* Cal.B. & P.Code § 18600. Plaintiff refused to pay the tax following its telecast of the Holyfield versus Tyson boxing match of June, 28, 1997, and brought this action to declare the tax unconstitutional under the First and Fourteenth Amendments and to enjoin its enforcement. Defendants, members of the State Athletic Commission ("the Commission") responsible for collecting and enforcing the tax, move for dismissal for lack of subject matter jurisdiction and for failure to state a claim, and also move for summary judgment. Fed.R.Civ.P. 12(b)(1), (6); 56. Plaintiff also moves for summary judgment.

The material facts are straightforward and undisputed. Plaintiff broadcasts programming to its subscribers by satellite. This programming includes pay-per-view telecasts of boxing, martial arts, and wrestling events. The Boxing Act requires broadcasters of such telecasts viewed in California to pay to the Commission a five percent tax on their gross receipts. *See* Cal.B. & P.Code §§ 18600, 18625, 18832.[1] The Commission deposits the revenues in the state general fund.

On June 28, 1997, plaintiff sold pay-per-view telecasts of a live boxing contest held in Nevada between Evander Holyfield and Mike Tyson. Plaintiff sold these telecasts to subscribers in California. Defendants demanded payment of the tax required by section 18832. Plaintiff refused to pay the tax, and inquired whether a procedure existed by which it could pay the tax and then seek a refund. Defendants have not responded to this inquiry. Plaintiff has scheduled future pay-per-view telecasts of contests covered by Section 18832 which it plans to sell to subscribers in California.

Defendants' motion to dismiss for lack of jurisdiction under Rule 12(b)(1) is based upon the Eleventh Amendment and the Tax Injunction Act. The court will examine each argument in turn.

The Eleventh Amendment to the United States Constitution states that,

[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or

---

1. "Every person who charges and receives a fee for exhibiting a simultaneous telecast of any live, current, or spontaneous contest or wrestling exhibition on a closed-circuit telecast viewed within this state shall ... pay to the commission a 5 percent tax, exclusive of federal taxes thereon, of the amount paid for admission or subscription telecast, as defined in Section 18830, to the showing or viewing of the contest or wrestling exhibition." Cal.B. & P.Code § 18832.

"Contest and match are synonymous, may be used interchangeably, and include boxing, kickboxing, martial arts exhibitions, and mean a fight, prize-fight, boxing contest, pugilistic contest, kickboxing contest, martial arts contest, between two or more persons, where full or partial contact is used or intended which may result or intended [sic], to result in physical harm to the opponent." *Id.* at § 18625.

prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Though styled as an "immunity," the Eleventh Amendment limits the subject-matter jurisdiction of the federal courts. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 53, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996). It applies to suits arising under either federal or state law, and to those brought in diversity. *See id.* 116 S.Ct. at 1122; *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *see also Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890) (Eleventh Amendment immunity extends to suits brought against a state by its own citizens).[2]

■■ Under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), however, "[t]he Eleventh Amendment does not bar federal court actions against state officials to enjoin them from enforcing unconstitutional statutes." *Capitol Industries–EMI, Inc. v. Bennett,* 681 F.2d 1107, 1120 (9th Cir. 1982). While merely characterizing relief as "equitable" does not license a suit that would operate as a money judgment against the state, *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), or a quieting of title against state interests, *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), the *Ex Parte Young* doctrine does not require an injunction to be "totally without effect on the State's revenues." *Edelman,* 415 U.S. at 667, 94 S.Ct. 1347.

Defendants argue that because plaintiff seeks to enjoin the Commission from enforcing a tax obligation which plaintiff has already incurred under California law, plaintiff's lawsuit does not seek "prospective" injunctive relief within the meaning of the *Ex parte Young* exception. In *Capitol Industries–EMI,* the Ninth Circuit permitted a suit to enjoin the California Franchise Tax Board from collecting seven years worth of back taxes. The court rejected Eleventh Amendment immunity, finding that the case fell "squarely within the doctrine of *Ex Parte Young.*" *Capitol Industries–EMI,* 681 F.2d at 1120. "In such cases, the Eleventh Amendment does not preclude access to the federal courts." *Id.* On the issue of Eleventh Amendment immunity, this case cannot be distinguished from *Capitol Industries–EMI.* Accordingly, the Eleventh Amendment does not bar the instant suit.[3]

■■ The Tax Injunction Act provides that "[t]he district courts shall not enjoin, suspend, or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state." 28 U.S.C. § 1341. When they apply, these simple words constitute a "broad jurisdictional barrier" to either declaratory or injunctive actions against a state taxation scheme. *Arkansas v. Farm Credit Services of Cent. Arkansas,* 520 U.S. 821, 117 S.Ct. 1776, 1779, 138 L.Ed.2d 34 (1997).

■ In order for the Tax Injunction Act to preclude jurisdiction, the state must offer the taxpayer a "plain, speedy and efficient" means of challenging or recovering the tax. 28 U.S.C. § 1341. "Succinctly put, the state remedy is 'plain' as long as the remedy is not uncertain or unclear from the outset; 'speedy' if it does not entail a significantly greater delay than a corresponding federal procedure; and 'efficient' if the pursuit of it does not generate ineffectual activity or unnecessary expenditures of time or energy." *U.S. West, Inc. v. Nelson,* 146 F.3d 718, 725 (9th Cir.1998) (interpreting identical exception to 28 U.S.C. § 1342 (public utility rate-

---

**2.** Section 1983 does not contain an abrogation of Eleventh Amendment immunity. *See Quern v. Jordan,* 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

**3.** Moreover, defendants do not contest that plaintiff seeks "prospective" relief, even under their definition, in that plaintiff has scheduled future broadcasts of events covered by the Boxing Act tax.

payer suits), and citing *Rosewell v. LaSalle Nat'l Bank,* 450 U.S. 503, 517–521, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981) (Tax Injunction Act case)). A scheme whereby a taxpayer pays the tax under protest and then appeals to the state for a refund constitutes a "plain, speedy and efficient remedy." *Jerron West v. California State Bd. of Equalization,* 129 F.3d 1334, 1338 (9th Cir.1997). Thus, the availability to plaintiff of a remedy under California law will determine the applicability of the Tax Injunction Act.

■■■ California, however, has its own jurisdictional bar against challenging the assessment of a tax.

> No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such a manner as may be provided by the Legislature.

Cal. Const. art. xiii, § 32 ("Section 32"). Section 32 both bars all actions for declaratory or injunctive relief from a tax, and gives the legislature exclusive control of whether and under what conditions a taxpayer may recover a tax paid under protest. *Woosley v. California,* 3 Cal.4th 758, 789, 13 Cal.Rptr.2d 30, 838 P.2d 758 (1992).

In light of Section 32, the court cannot find a "plain" cause of action or procedure by which this tax, if paid, might be recovered under California law. The court looks first to the Boxing Act itself. That law contains no express scheme for the refunding or challenging of an illegal or erroneous tax. *See* Cal.B. & P.Code §§ 18600 *et seq.* In this sense, the Boxing Act differs from the statutory scheme for the recovery of taxes collected by the Board of Equalization. *See* Cal.Rev. & Tax Code §§ 6901, 6902, 6932; *see also Jerron West,* 129 F.3d at 1338 (Board of Equalization procedures constitute a " 'plain, speedy and efficient' remedy under the [Tax Injunction] Act").

The court looks next to Cal.B. & P.Code § 158, which defendants claim creates a procedure for recovering the tax. Section 158, however, applies to "application fees, license fees or penalties" collected by the Department of Consumer Affairs or its Director. *See* Cal.B. & P.Code §§ 100–471 (Department of Consumer Affairs). The Boxing Act tax is collected by the State Athletic Commission and thus, by its very terms, § 158 does not apply.

Finally, the court looks to Cal.Gov.Code § 13143, which provides that in general:

> [w]henever any law which provides for fees or payments to a state agency does not authorize, as provided in this article, the refund of erroneous or excessive payments thereof, refunds may be made by the state agency which collected the fee or payment of any or all amounts received ...

Cal.Gov.Code § 13143 (emphasis supplied). Defendants argue that in light of *Woosley v. California,* which did not concern Cal. Gov.Code § 13143, the court should "imply" a cause of action for plaintiff under that section, despite the strong language of Section 32 to the contrary. Defendants argue that § 13143 is similar to the Code sections at issue in *Woosley.* Defendants' arguments have no merit.

*Woosley* involved a lawsuit to recover vehicle license fees and sales and use taxes collected under the Revenue Code and the Vehicle Code. Express refund procedures exist for both kinds of payments. With regard to the license fee, the Revenue Code provides:

> [w]henever the department of [of motor vehicles] erroneously collects any license fee ... the amount shall be refunded to the person paying it upon application therefor made within three years after the date of the payment.

Cal.Rev.Code § 10901. With respect to use taxes, the Revenue Code provides that erroneously paid taxes "shall be refunded" by the Board of Equalization. Cal.Rev. Code § 6901. If the Board of Equalization rejects the taxpayer's statutorily authorized claim, the taxpayer may bring an

action against the Board in a court of law. Cal.Rev.Code §§ 6933–6934.

Even a cursory comparison of these statutes contradicts defendants' reading. Sections 13140–13144 of the Government Code authorize agencies to make refunds, limit the circumstances under which they may do so, and include intra-governmental provisions for specifying where the money will come from. Sections 6933–6934 and 10901 state that erroneous fees "shall be refunded," and spell out procedures by which a taxpayer may proceed first before the agency and then, if unsuccessful, in a court of law. No comparable procedures are provided here.

Moreover, the analysis of the California Supreme Court in *Woosley* indicates that, in a case such as this, all doubts must be resolved against the implication of a taxpayer claim. *Woosley* raised two issues regarding Section 32. The taxpayers argued that class claimants who had paid the license fee, but who had not made a claim against the Department of Motor Vehicles or signed their consent to the lawsuit, could still be made part of the class action with regard to license fees. In the case of use taxes, the *Woosley* court also had to determine whether the legislature had authorized class claims at all.

The California Supreme Court resolved both questions against the taxpayers, overturning a number of lower appellate court cases to the contrary and despite the general authorization of class claims against the state under Cal.Gov.Code § 910. The court held that tax refunds are different from other kinds of claims. *Woosley,* 3 Cal.4th at 789, 13 Cal.Rptr.2d 30, 838 P.2d 758. "The California Constitution expressly provides that actions for refunds must be brought in the manner prescribed by the Legislature." *Id.* "This constitutional limitation rests on the premise that strict legislative control over the manner in which tax refunds may be sought is necessary so that governmental entities may engage in fiscal planning based on expected tax revenues." *Id.*

■ Thus, contrary to defendants' position, *Woosley,* if anything, indicates that Section 32 does not permit a court to interpret a provision of California law to "imply" a cause of action for refund of the Boxing Act tax. In light of Section 32, defendants' proposed reading of California law is untenable; moreover, the mere hypothetical possibility of a cause of action does not constitute the "plain" remedy required by the Tax Injunction Act. *See U.S. West,* 146 F.3d at 725 ("the state remedy is 'plain' as long as the remedy is not uncertain or unclear from the outset").

■ If plaintiff could maintain its § 1983 action in California state court, that would satisfy the requirements of the Tax Injunction Act. *See Fair Assessment in Real Estate Ass'n, Inc. v. McNary,* 454 U.S. 100, 117, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981) (ability to pursue § 1983 claim in state court constitutes adequate remedy); *see Brown v. Pitchess,* 13 Cal.3d 518, 119 Cal.Rptr. 204, 531 P.2d 772 (1975) (California courts can hear federal claims); *Martinez v.. California,* 444 U.S. 277, n. 7, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). Even if such an action were authorized, however, Section 32 would bar a California court from hearing plaintiff's claim for injunctive relief. Moreover, § 1983 does not even authorize a suit for damages against a state or against a state official in his official capacity.[4] *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Plaintiff thus could not maintain a § 1983 action for refund of the tax in state court.[5] In fact, it

---

4. Moreover, defendants point to no statute authorizing the California courts to hear federal claims for state-tax refunds, nor to any case law construing Section 32 to permit them.

5. This finding also comports with the decision of the Ninth Circuit in *Direct Marketing Ass'n,*

*Inc. v. Bennett,* 916 F.2d 1451 (9th Cir.1990). There, the Court of Appeals considered a federal constitutional challenge to a California tax. Though it did not explicitly address the issue, the court in holding that the Tax Injunction Act did not bar jurisdiction necessarily ruled that the plaintiff did not have a

appears plaintiff has challenged the tax by the only means available to it. Defendants' motion to dismiss must be denied, and the court proceeds to consider the cross-motions for summary judgment.

 The Boxing Act Tax imposes a five percent gross receipts tax exclusively on telecasts of boxing, martial arts, and wrestling events, as well as on telecasts of other combative contests. "A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Simon & Schuster, Inc. v. New York Crime Victims Board,* 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991); *Leathers v. Medlock,* 499 U.S. 439, 447, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991) ("[f]or reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech").[6] In *Arkansas Writers' Project v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), the Court held invalid a statutory scheme that exempted from a general sales tax only those journals with a generally religious, sports, professional, or trade-oriented content. "[O]fficial scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press." *Arkansas Writers' Project, Inc.,* 481 U.S. at 230, 107 S.Ct. 1722.

 On its face, the Boxing Act taxes some telecasts, and not others, based on the content of those telecasts. Television broadcasts constitute speech. *See, e.g., Leathers,* 499 U.S. at 444, 111 S.Ct. 1438; *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 65, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). The Boxing Act thus taxes some speech based solely on its content. Under *Leathers, Arkansas Writers' Project,* and the weight of First Amendment jurisprudence, the tax should be immediately subjected to strict scrutiny. Defendants, however, contend that because the Free Speech Clause does not protect the act of boxing or combat itself, it similarly does not protect boxing telecasts of such activities.[7]

 As a threshold matter, defendants have not convinced the court that First Amendment protection does not attach to a live boxing match organized, held, and televised for the purpose of entertaining live and remote viewers. The First Amendment protects entertainment. *Schad,* 452 U.S. at 65, 101 S.Ct. 2176. It protects live entertainment, including even the expressive content of nude dancing. *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). Under *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), a general law that impacts conduct with expressive and non-expressive elements must be "within the constitutional power of the government," and in furtherance of "an important or substantial governmental interest [that] is unrelated to the suppression of free expression." *O'Brien,* 391 U.S. at 376–377, 88 S.Ct. 1673; *see Barnes,* 501 U.S. at 572, 582, 111 S.Ct. 2456 (plurality). The law may be upheld only if its "incidental restriction on alleged First Amendment Freedoms is no greater than is essential to the furtherance of that interest." *Id.* 391 U.S. at 377, 88 S.Ct. 1673.

sufficiently plain, speedy, and efficient section 1983 remedy in state court.

6. In *Leathers,* the Court considered an exemption for print media from a general sales tax. The Court found the exemption to be constitutional, even though the sales tax applied to other forms of expression, such as cable television, as well as sales of non-expressive goods. The instant case involves a tax based on content, and hence differs fundamentally from the facts of *Leathers.*

7. Defendants do not contend that the instant telecasts fall into any of the categories of speech which receive a special analysis under the First Amendment, such as obscenity, defamation, immediate incitement to lawless action, or speech calculated and likely to bring about imminent harm the state has the substantive power to prevent. *See e.g., Simon & Schuster,* 502 U.S. at 124, 112 S.Ct. 501 (Kennedy, J., concurring) (summarizing special categories).

The court need not even reach the *O'Brien* analysis, however, because this suit does not merely involve the application of a general law, such as a ban on public nudity, on the burning of draft cards, or on physical combat, to conduct with both expressive and non-expressive elements. *Cf. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (public nudity); *U.S. v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (draft cards). Moreover, plaintiff is not a boxer or boxing promoter; plaintiff sells entertainment, the moving images and sound recorded at boxing and other combative contests.[8]

▪ Thus, it simply does not matter in the instant case whether the First Amendment protects or even applies to boxing. A tax on the dissemination of entertainment based on content must pass strict scrutiny, regardless of its subject matter. *Simon & Schuster*, 502 U.S. at 115, 112 S.Ct. 501; *Arkansas Writers' Project*, 481 U.S. at 230, 107 S.Ct. 1722. The First Amendment does not protect murder, yet the court feels confident that news broadcasts of murder, killing, or war may not be censored to suppress their content. Nor is a hurricane protected by the First Amendment; yet a broadcaster with an audience has a right under the First Amendment to broadcast images of a hurricane. Defendants' argument, that telecasts of boxing do not enjoy First Amendment protection because boxing is somehow "less valuable" than other subjects, runs contrary to every principle of the Free Speech Clause itself.

This question has arisen before. In *Simon & Schuster*, for instance, the Supreme Court considered New York's "Son of Sam" law. That law required that an accused or convicted criminal's income from works describing his crime be deposited in an escrow account for distribution to the victims of the crime. *Id.* at 108, 112

S.Ct. 501. The First Amendment certainly does not protect participation in crime, yet the Court in overturning the Son of Sam law held that the Free Speech Clause did protect the real-life, first-person description of criminal activities by a convicted felon. *Id.* at 116–118, 112 S.Ct. 501. Like the Son of Sam law, the Boxing Act tax "singles out income derived from expressive activity for a burden the state places on no other income," by creating "a financial disincentive" to broadcast telecasts with a particular content. *Id.* at 116–118, 112 S.Ct. 501. Like the Son of Sam law, the Boxing Act therefore violates the First Amendment unless it passes strict scrutiny.

▪ Because the undisputed facts establish that the Boxing Act tax must survive strict scrutiny, defendants would at trial bear the burden of proving the tax to be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." *Id.* at 118, 112 S.Ct. 501. To resist plaintiff's motion for summary judgment, they must therefore offer specific facts from which a rational trier of fact could so conclude. Fed.R.Civ.P. 56.

▪ Defendants argue that the state has a general interest in raising revenue. While this interest has been described as "critical" and "important," as a matter of law it does not justify a content-based tax on speech. *Arkansas Writers' Project*, 481 U.S. at 231–232, 107 S.Ct. 1722 ("an alternative means of achieving the same interest [raising revenue] without raising concerns under the First Amendment is clearly available: the State could raise the revenue by taxing businesses generally"), quoting *Minneapolis Star & Tribune v. Minn. Com'r of Rev.*, 460 U.S. 575, 586, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).

8. Plaintiff has submitted a videotape recording of the Holyfield versus Tyson fight of June 28, 1997. This recording includes roughly 2.5 hours of commentary and undercard matches which preceded the Tyson versus Holyfield bout. The broadcast includes not only images from multiple cameras arranged with the goal of providing maximum entertainment to the viewer, but also includes interviews, narrated documentary, and blow-by-blow commentary on the fight itself.

Next, defendants contend that the Boxing Act tax defrays the cost of running the State Athletic Commission, and assert that the tax assists the Commission "in its efforts to keep boxing clean."[9] While speech may be taxed to help pay for the costs created by the speech itself, such as in the case of parades, *Cox v. New Hampshire*, 312 U.S. 569, 577, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), *Murdock v. Pennsylvania*, 319 U.S. 105, 113–114, 63 S.Ct. 870, 87 L.Ed. 1292 (1943),[10] the state may not merely use supposed "administrative costs" as a guise for raising revenue. *See, e.g., Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1205 (11th Cir.1991). Defendants, who as State Athletic Commissioners are presumably in a position to know, present no evidence or argument whatsoever on the amount of the costs, if any, incurred to the Commission by plaintiff's telecasts into private homes of boxing matches which occur in another state. Defendants do not even suggest how much money they spend every year to "keep boxing clean." Thus, even if the court could conclude that defendants have raised compelling interests, which it cannot, the court cannot conclude that the Boxing Act tax has been narrowly tailored to serve them.

Defendants quite simply present no evidence whatsoever that the amount of the Boxing Act tax bears any relationship to anything. Defendants present no evidence on the amount of revenues created, on the current "costs" of the State Athletic Commission (in 1965 the budget of the Commission amounted to around $20,000) as related to boxing telecasts, or on the cost to the state, if any, of plaintiff's speech. Clearly, the Commission does not directly spend all of the revenues raised by the Boxing Act tax, because it deposits those revenues in the state general fund.

Finally, defendants suggest that the tax must be imposed to "equalize [the] tax burden between live shows, closed-circuit telecasts, and non-closed circuit broadcasts and telecasts."[11] The state collects numerous licensing fees from persons who wish to box in California, as well as from those who wish to train, promote, manage, or referee boxers in California. Cal.B. & P.Code §§ 18802–18822. The state also collects a five percent tax on all tickets sold for live boxing events held in California, as well as on all sales of broadcast or television rights with respect to such contests. Cal.B. & P.Code § 18824. Section 18832, the statute at issue, imposes a five percent tax on all closed-circuit telecasts, regardless of the initial location of the event. It thus imposes an "equal" tax burden, at least superficially, in that the percentage of tax is five percent in all cases.

Defendants, however, do not explain why the state has a compelling interest in imposing an "equal" tax on plaintiff's speech. The fact that a tax is imposed on tickets sold to live boxing events held in California does not automatically justify an extension of that tax to satellite broadcasts of boxing events held in or out of California. Defendants similarly do not explain why the principle of "equalization" could not be served, and indeed would not be better served, by an overall taxation scheme which made no reference to the content of the speech to be taxed. Though defendants at oral argument contended that the Boxing Act tax prevents boxing promoters from evading the live-events tax

---

by moving their matches out-of-state, this argument simply devolves to the state's interest in raising revenue, which, as already explained, does not justify a content-specific tax.